IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INFINITY COMPUTER PRODUCTS INC., <br><br> Plaintiff, <br><br> v. <br><br> TOSHIBA AMERICA BUSINESS SOLUTIONS, INC., <br><br> Defendant. | Civil Action No.: 2:12-cv-06796-NIQA <br><br> (LEAD CASE) |

### DECLARATION OF DR. MARC E. LEVITT IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PRE-ISSUANCE DAMAGES AND ABSOLUTE INTERVENING RIGHTS

I, Marc E. Levitt, hereby declare:

I.  **BACKGROUND AND QUALIFICATIONS**

1.  My name is Marc E. Levitt. I am over 21 years of age, am of sound mind, and am competent to make this declaration.

2.  The patents at issue here include U.S. Patent No. 6,894,811, U.S. Patent No. 7,489,423, U.S. Patent No. 8,040,574, and U.S. Patent No. 8,294,915 (the "Patents-in-Suit).

3.  I was previously a declarant during the reexaminations of Patents-in-Suit on behalf of Plaintiff Infinity Computer Products, Inc.

4.  I received my bachelor's degree (with high honors) in Computer Engineering from Lehigh University in 1986. I also have masters and doctorate degrees in Electrical Engineering from the

University of Illinois at Urbana-Champaign. I received those degrees in 1988 and 1990, respectively.

5. After graduation, I worked for the following companies in microprocessor, integrated circuit, and system-on-a-chip architecture, design, and manufacturing. Sun Microsystems Inc. where I helped lead the design of the UltraSPARC family of microprocessors (I, I+, II, II+, IIe, III, & IV) and contributed to the design and manufacturing of the SuperSPARC and microSPARC families too. Transmeta Inc. where I was a consultant and key developer of the Crusoe family of low power microprocessors, later architected the system chip functionality (Northbridge and Southbridge) of the Efficeon family of CPUs, and lead the design of the TM6000 Solo PC-on-a-chip project. I have had extensive experience in the PC industry during this time. In addition to Sun and Transmeta I have worked for or consulted with: Sonics Inc. a semiconductor IP supplier, Raycer Graphics (now part of Apple) a graphics chip designer, CNEX Labs, Cadence Design Systems Inc. a supplier of design automation tools to microprocessor and other semiconductor designers, and Video of Cellular Inventions LLC as Chief Technology Officer a provider of wireless communications hardware and software now owned by Samsung.

6. I have been a named inventor on fifteen patents in the areas of circuit design, logic design, hardware testing, software, diagnosis and formal verification. I have also published over 30 journal articles, conference publications and book chapters. I am a member of the Tau Beta Pi and Eta Kappa Nu Engineering Honor Societies, and have been a guest editor of the IEEE Design & Test of Computer magazine and given Keynote Addresses at IEEE and SPIE Conferences.

7. I was a paid for this declaration by the hour and payment was not contingent on nor dependent on the content of my opinions herein.

8. This declaration provides how a person of ordinary skill in the art at the time of the invention would interpret the claim scope of certain terms that were amended during the reexaminations of the Patents-in-Suit.

## II. MATERIALS CONSIDERED

9. In connection with preparing this declaration I have reviewed the following materials:

- Each of the Patents-in-Suit and their corresponding file histories; and
- U.S. Patent No. 5,530, 558 and its corresponding file history.

## III. BACKGROUND OF THE REEXAMINATIONS

10. During the reexaminations, two groups of claims were amended to aid the examiner's understanding without altering the claim scope. Each of the Patents-in-Suit is based on the same specification, and the specification was not altered during reexamination.

11. It is my opinion that neither of these two groups of amendments altered the scope of the corresponding claims.

### A. First Group: Claims In Which Reexamined Claims Were Amended To Recite "Generic" Send/Receive Driver Communications Software.

12. The first group of claims that were amended during reexamination consist of the following:

- reexamined claims 1-6 and 18-20 of U.S. Patent No. 6,894,811C1;
- reexamined claims 1-6 of U.S. Patent No. 7,489,423C1;
- reexamined claims 1-8 of U.S. Patent No. 8,040,574C1; and
- reexamined claims 1-4, 6-12, 14, and 15 of U.S. Patent No. 8,294,915C1.

13. Each of these claims was amended to recite the word "*generic*" preceding the phrase "send/receive driver communications software" (or an equivalent "software" term) in the

corresponding originally-issued claim. (*See* Declaration of Mark Halderman (the "Halderman Decl."), Exhs. A, H, I and J, collectively the "Patents-in-Suit").

14. Only the independent claims were amended. All dependent claims inherently include every recitation of the independent claim from which it depends. Thus, each of the recited claims was effectively amended, either literally or by amendment of a separate independent claim.

### B. Second Group: Claims In Which Reexamined Claims Were Amended To Recite Use Of An "Unmodified Standard Protocol" for Communications Between a PC and a Facsimile Machine.

15. The second group of claims that were amended during reexamination consist of claims 7-17 of U.S. Patent No. 6,894,811C1. Specifically, each claim was amended to recite "using an unmodified standard protocol for" preceding "shifting the personal computer to . . ." in the corresponding originally-issued claims. (*See* Halderman Decl. Exh. A, the "'811 Patent").

## IV. APPLICABLE LEGAL STANDARDS

### A. Level of Ordinary Skill in the Art

16. I understand that the disclosure and claims of a patent are read and understood from the perspective of a hypothetical a person of ordinary skill in the art at the time of the invention ("PHOSITA").

17. It is my understanding that this hypothetical person is not a genius or expert in the art at hand, and is not necessarily represented by the skill, education, or experience of the inventor. I have been informed that while this person of ordinary skill in the art has common sense and is not an automaton, he or she thinks along conventional lines and does not seek to innovate.

18. I have been informed that there are several factors that may be used in determining the level of ordinary skill in the art, including but not limited to (1) the educational level of the inventors; (2) the types of problems encountered in the art; (3) the prior art solutions to these problems; (4) the rapidity with which innovations are made; (5) the sophistication of the

technology; and (6) the educational level of active workers in the field. I have further been informed that these factors may not be present in every case and that some factors may be more significant in some cases than in others.

19. Based on the above factors, it is my opinion that the level of ordinary skill in this art at the time of filing of the Patents-in-Suit would have been someone with at least a B.S. in electrical engineering or equivalent, or at least 3 years of experience in the field of designing telecommunications systems or driver and embedded software.

### B. 35 U.S.C. § 252 Standard For "Pre-Issuance Damages" and "Absolute Intervening Rights"

20. I have been informed by counsel that Defendants assert in their Motion two arguments under 35 U.S.C. § 252 - "pre-issuance" damages and the doctrine of absolute intervening rights. It is further my understanding that these arguments are based on certain amendments (described above) that Infinity made during the reexaminations of the Patents-in-Suit.

21. Counsel has further informed me that these defenses only apply if the reexamined claims are substantially identical to the original claims. To determine if the claims have been substantively changed, it must be determined if the *scope* of the amended claim has changed from the originally issued claims (as opposed to mere a change in wording).

22. To determine the scope of the original and amended claims, ordinary claim construction principles are applied. When applying ordinary claim construction principles to construe the claims, it is my understanding that the court may examine both intrinsic evidence (e.g., the patent, its claims, the specification and prosecution history) and extrinsic evidence (e.g., expert reports, testimony and anything else). The specification of the Patents-in-Suit, however, is the single best guide to determine the meaning of the disputed terms and is usually dispositive. When construing

5

claims, the test is an objective one as to what a PHOSITA would have understood the terms to mean.

23. Further, I was informed by counsel that when relying on the prosecution history of a patent, including statements made during reexamination, that amendments made during reexamination do not necessarily compel a conclusion that the scope of the claims has been substantively changed even where the claims at issue were amended during reexamination after a rejection based on prior art. Rather, an argument made to an examiner constitutes a disclaimer only if it is "clear and unmistakable."

24. I further understand that the patent examiner applies the broadest reasonable interpretation standard in construing claims, whereas the district court applies the *Phillips* standard. Thus, a finding by the patent examiner that a particular term is broad does not necessarily mean that the district court should also construe it broadly.

## V. A PHOSITA WOULD UNDERSTAND THAT BOTH THE ORIGINAL AND AMENDED CLAIM TERMS HAD THE SAME CLAIM SCOPE.

### A. The First Group of Amendments

25. It is my opinion that a PHOSITA reading the Patents-in-Suit as a whole, in view of the specification and prosecution history, would support Infinity's proposed construction that the "send/receive driver communications software" was "generic" both before and after the reexamination amendments.

26. Indeed, the specification makes clear that the very objective of the Patents-in-Suit is to the utilize generic standard protocols and send/receive communications software of the existing facsimile machines ("Fax") and personal computers ("PC") to solve a problem in the prior art caused by non-generic communication software. (*See* '811 Patent at 1:31-45) ("It has been recognized that conventional facsimile machines may be utilized as scanners or printers for PCs.

6

However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity. It is, therefore, a principal object of the present invention to provide a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.").

27. It is further clear that the identity of the PC and the Fax are immaterial. (*See* '811 Patent at 4:59-60) ("The PC, which may be any type of computer…"); (*see also id.* at 5:17-20).

28. The specification also discloses that the communications and/or signaling between the PC and the Fax are generic. (*See* '811 Patent. at 8:50-63) ("[T]he present invention is highly simplified in design and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of . . . [and] provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another . . .").

29. Reading these passages, it is my opinion that a PHOSITA would understand that the invention always related to a "generic" connection between a PC and a Fax.

30. The specification goes on to further indicate that the "send/receive communications software" must be "generic." This is clearly disclosed in Figure 2g and the text corresponding to this figure. (*See* '811 Patent at 8:4-26). As illustrated in Figure 2g, which is reproduced below, the "send/receive communications software" is identified interchangeably as *"generic send/receive driver communications"* software and simply as "send/receive driver communications software" in the portion of the specification that describes the Figure 2g. (*See id.* at 8:4-26).



Fig. 2g

(*Id.* at Fig. 2g) (highlighting added).

31. The specification also discloses that "[a]ny available [send/receive driver communications] software package is acceptable." (*See* '811 Patent at 8:24-26). The function of the "send/receive driver communications software" is described without any further description of the characteristics or identity of the PC or the Fax. (*See id.* at 8:15-20).

32. In addition, the specification discloses that the "send/receive driver communications software has the ability to send a digital image to the facsimile machine for printing purposes" and that the "facsimile machine's control/modem *circuitry* receives the digital image and it is then processed by the print driver 77 for printing." (*See* '811 Patent at 8:17-22) (emphasis added). The Certificate of Correction added "receives the digital image and it is" after "circuitry" in column 8, line 21.

33. The specification describes that the "[t]he circuitry of the present invention is *highly simplified in design* and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of ... [and] *provides all the necessary signal conditions* which lead the PC and local facsimile machine to believe that

8

they are communicating with one another over a telephone line." (*See* '811 Patent at 8:50-59) (emphasis added).

34. Again, it is my opinion that a PHOSITA reading "send/receive driver communications software" in light of these passages would understand the term to be "generic" and not "specifically tailored" to any particular PC or Fax machine. In fact, all of the embodiments depicted in diagrams 2a-2j interject an "Interfacing CKT 10" between the fax modem circuitry of the PC computer and the fax modem circuitry of the facsimile machine. (*See* '811 Patent at 5:64-7:31).

35. The primary purpose of the "Interface CKT 10" is to allow both the facsimile machine and the PC to use their existing generic send/receive driver communications software for communications. The specification, however, provides no support whatsoever for Defendants' position that the "send/receive driver communications software" may also be "specifically tailored."

36. Therefore, it is my opinion that a POSTIA reading the original claims in the context of the entire patent, can only reach the conclusion that the "send/receive driver communications software" is "generic."

37. The prosecution history further supports this construction. For example, the patentee described PC↔Fax communication in an amendment during the prosecution of an original claim in the '811 Patent as "data transferred in a conventional way, and without manipulation, or modification of the original signals." (*See* Halderman Decl., Exh. B, September 2, 1998 Amendment (adding claim 27, which ultimately issued as claim 1)). That claim was later amended to explicitly recite "send/receive driver communications software" and the software was described by the patentee as "***standard*** communications software ***available for most computers*** . . . ." (*See* Halderman Decl., Exh. C, January 17, 2002 Amendment (amendment to claim 27, which

9

ultimately issued as claim 1)) (emphasis added). The patent examiner also described "generic" send/receive driver communications software as "software capable of sending and receiving data in a general sense, and [ ] not limited to any particular type of data." (*See* Halderman Decl., Exh. D, February 10, 2012 Final Rejection at p. 5).

38. Therefore, it is my opinion that a PHOSITA reading that claims, specification and the prosecution history, would interpret the scope and meaning of the term as remaining the same – namely, the term always meant "*generic* send/receive driver communications software."

### B. The Second Group of Amendments

39. The second group of claims was amended in reexamination to recite "using an unmodified standard protocol for" preceding "shifting the personal computer to . . ." in the corresponding originally-issued claim of U.S. Patent No. 6,894,811B1.

40. Again, as with the "send/receive driver communication software" terms, the specification clearly discloses that the invention involves interfacing a PC with a Fax, (*See* '811 Patent at 1:39-40), that the identity of the PC, (*see id.* at 4:59-60), and the Fax, (*see id.* at 5:17-20), are immaterial, and that standard protocols are used for communications between a PC and a Fax, (*see id.* at 5:48-51).

41. This requirement is also directly referred to in the specification. (*See* '811 Patent at 8:50-59) ("The circuitry of the present invention is highly simplified in design and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of ... [and] *[t]he circuitry* of the present invention [i.e., not the send/receive driver communication software] provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another over a telephone line") (emphasis added).

10

42. It is my opinion that a PHOSITA would understand from these disclosures that the generic nature of the PC and Fax communication teaches the use of unmodified standard protocols, because the PC and Fax would not be expected to reliably communicate if the protocols were specific to one or the other or if the protocols were modified to be different from standard protocols.

43. For this reason, the claims of the second group, as originally issued, inherently required use of "unmodified standard protocols," meaning that addition of that phrase to the reexamined claims did not alter their scope or meaning.

44. In addition to being clearly disclosed in the specification, the prosecution history of the reexamined "unmodified standard protocol" claims is also consistent with these claims having a scope and a meaning that was not changed during reexamination. Referring to the claims pending in the application prior to its original issuance, the patentee described communications between the PC and the Fax as involving, "data transferred in a conventional way, and without manipulation, or modification of the original signals." (*See* Halderman Decl., Exh. B, September 2, 1998 Amendment).

45. Further, during the course of reexamination, the patentee distinguished the claims from a prior art reference by pointing out that the patentee's specification clearly indicates use of standard protocols for PC↔Fax communications. These reexamined claims were simultaneously amended to recite "using an unmodified standard protocol for" to emphasize or clarify this difference between the claimed subject matter and the prior art but, as set forth above, the amendment did not alter the scope or meaning of those claims. (*See* Halderman Decl., Exh. E, November 21, 2011 Amendment at p. 9) ("the methods of the instant patent enable a conventional facsimile machine

11

to communicate with a personal computer, and vice versa, using 'a standard protocol'") (citation to specification omitted).

46. In response to that clarification, the patent examiner admitted the difference between the prior art and the claimed invention and allowed the reexamined claims. The prosecution history includes no "clear and unmistakable disavowal [of] claim scope" accompanying this amendment to the reexamined "unmodified standard protocol" claims. Rather, it is clear that a PHOSITA would view the amendments made during reexamination as merely making explicit what was already inherent in the originally-issued claims.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Dated: March 9, 2018

_____
Dr. Marc E. Levitt