# EXHIBIT 19

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,208 | 04/10/2014 | 6894811 | 105413-0007-506 | 7153 |

7590       12/07/2015

MARVIN NACHMAN
315 SAYBROOK RD
VILLANOVA, PA 19085

| EXAMINER |
|---|
| WASSUM, LUKE S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/07/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Infinity0024242

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

ROPES & GRAY LLP
IPRM - FLOOR 43
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/013,208*.

PATENT NO. *6894811*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

Infinity0024243

Application/Control Number: 90/013,208                                      Page 2
Art Unit: 3992

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

Application Number: 90/013,208
Filing Date: April 10, 2014
Appellant(s): Infinity Computer Products, Inc.

Marvin J. Nachman
For Appellant

## EXAMINER'S ANSWER

This is in response to the appeal brief filed September 14, 2005.

Infinity0024244

Application/Control Number: 90/013,208                                    Page 3
Art Unit: 3992

### (1) Grounds of Rejection to be Reviewed on Appeal

Every ground of rejection set forth in the Office action dated February 11, 2015

from which the appeal is taken were modified by the advisory action mailed on May 7,

2015.  A list of rejections withdrawn by the examiner (if any) is included under the

subheading "Withdrawn Rejections."  New grounds of rejection (if any) are provided

under the subheading "New Grounds of Rejection."

Thus, the following grounds of rejection are applicable to the appealed claims:

Claims 1, 2, 4, 7, 8, 10, 16, 19, and 20 are rejected under 35 U.S.C. § 102(e) as

anticipated by U.S. Patent No. 5,900,947 to Kenmochi et al. ("Kenmochi").

Claims 3, 5, 9, 11, and 14 are rejected under 35 U.S.C. § 103(a) as unpatentable

over Kenmochi in view of U.S. Patent No. 5,218,458 to Kochis et al. ("Kochis '458").

Claims 7, 8, 10, 16, and 19 are rejected under 35 U.S.C. § 103(a) as unpatentable

over Kenmochi in view of U.S. Patent No. 4,802,204 to Chang ("Chang").

Claims 9, 11, and 14 are rejected under 35 U.S.C. § 103(a) as unpatentable over

Kenmochi in view of Chang and Kochis '458.


New Grounds of Rejection

(No new grounds of rejection are made.)

Application/Control Number: 90/013,208                                      Page 4
Art Unit: 3992

### Withdrawn Rejections

(No rejections are withdrawn.)

Infinity0024246

Application/Control Number: 90/013,208                          Page 5
Art Unit: 3992

### (2) Response to Argument

The appellant contends that the claims of U.S. Patent No. 6,894,811 ("the '811

patent") are entitled to the April 11, 1994 filing date of U.S. Application No. 08/266,278

("the '278 application") and therefore that the Kenmochi reference cited in the rejections

is not eligible as "prior art" under 35 U.S.C. § 102(e).  The examiner respectfully

disagrees.

The '811 patent issued from U.S. Application 08/669,056 ("the '056 application").

The '056 application was filed on June 24, 1996 as a continuation-in-part of the

'278 application.  The '278 application, now U.S. Patent No. 5,530,558 ("the '558

patent"), was filed on April 11, 1994.

The effective filing date of the Kenmochi reference is August 25, 1994.  The

Kenmochi reference was published on May 4, 1999.  Therefore, the eligibility of the

Kenmochi reference as "prior art" under 35 U.S.C. § 102(e) hinges on whether the claims

of the '811 patent are entitled to the April 11, 1994 filing date of the '278 application, or

are entitled only to the June 26, 1996 filing date of the continuation-in-part '056

application.

The examiner determined that each of the rejected claims of the '811 patent

includes subject matter relating to the transmission of "digital signals" that was first

disclosed in the continuation-in-part '056 application but was not disclosed in the '278

Infinity0024247

application.  In other words, each of the rejected claims includes subject matter for

which there is no written description support in the '278 application, and these claims

are entitled only to the June 26, 1996 filing date of the continuation-in-part '056

application.

The written description requirement is separate and distinct from the enablement

requirement.  See *Ariad Pharm. Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1341, 94 USPQ2d

1161, 1167 (Fed. Cir. 2010).  See MPEP § 2161(II).  The fundamental factual inquiry is

whether the <u>specification</u> conveys with reasonable clarity to those skilled in the art that,

as of the filing date sought, the applicant was in <u>possession</u> of the invention <u>as now</u>

<u>claimed</u>.  See, e.g., *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64, 19 USPQ2d 1111,

1117 (Fed. Cir. 1991).  See MPEP § 2163(I)(B).  "[The] hallmark of written description is

disclosure … [and] it is the <u>specification</u> itself that must demonstrate possession."

*Ariad*, 94 USPQ2d at 1172 (emphasis added).

Each claim limitation must be expressly, implicitly, or inherently supported in

the originally filed disclosure.  When an explicit limitation in a claim "is not present in

the written description whose benefit is sought it must be shown that a person of

ordinary skill would have understood, at the time the patent application was filed, that

the description <u>requires</u> that limitation."  *Hyatt v. Boone*, 146 F.3d 1348, 1353, 47 USPQ2d

1128, 1131 (Fed. Cir. 1998) (emphasis added).  See MPEP § 2163(II)(A)(3)(b).

Infinity0024248

Moreover, as noted in the Office action, a description that merely renders a

limitation obvious is not sufficient.  See *Lockwood v. American Airlines Inc.*, 107 F.3d 1565,

1571-72, 41 USPQ2d 1961, 1966 (Fed. Cir. 1997) ("Entitlement to a filing date does not

extend to subject matter which is not disclosed, but would be obvious over what is

expressly disclosed.  It extends only to that which is disclosed. … A description which

renders obvious the invention for which an earlier filing date is sought is not

sufficient.").

The limitations at issue are construed to cover the transmission of "digital

signals" to and from the facsimile machine, such as transmissions over a "digital

connector port."  While there is adequate support in the '278 application for *analog*

transmission of "digital data" to and from the facsimile machine (e.g., transmission of

digital data over an analog telephone line), there is no written description support for

*digital* transmission or transmission of "digital signals" to and from the facsimile

machine such as now claimed.

A distinction between *data* and the analog or digital *signals* by which the data is

transmitted is established in the record.  For example, the patent owner noted in the

instant proceeding that "there is a difference between transmission and the actual data

communicated over the transmission medium," asserting that "the '278 application

teaches analog *transmission* of digital *data*."  See the remarks filed on November 12, 2014

Infinity0024249

Application/Control Number: 90/013,208                                   Page 8
Art Unit: 3992

at page 6.  The examiner agrees that the '278 application discloses *analog* transmission or

transmission of "analog signals."

Limitations relating to transmission of "digital signals" were added to the claims

in the continuation-in-part '056 application in an attempt to distinguish the claims over

U.S. Patent No. 5,452,106 to Perkins ("Perkins").  At the time of the amendment, filed on

May 23, 2002, the applicant argued, for example:

> Perkins' device 3 design is limited to the transfer of only analog
> signals (not digital signals) from his device 3 to the facsimile
> transceiver, and his design can receive only analog signals (not
> digital signals) from the facsimile transceiver to his device 3.  In
> contrast, the Applicant can transfer digital signals between the
> facsimile transceiver and the computer in accordance with the
> Applicant's specification and numerous claims ... and as delineated
> in Figures 2F, 2G, and 2H.

(Remarks filed on May 23, 2002 in App. No. 08/669,056 at pages 7-8.)  Likewise, in the

response filed on September 26, 2002, the applicant argued:

> Perkins' device 3 design or card incorporating device 3 is limited to
> the transfer of only analog signals (not digital signals) from his
> device 3 to the facsimile transceiver, and his design can receive
> only analog signals (not digital signals) from the facsimile
> transceiver to his device 3.  In addition, Perkins' device 3 or card
> design requires a modem to be integrated into it in order to transfer
> signals for scanning or printing as part of his computer and
> facsimile transceiver interface.   In contrast, the Applicant can
> transfer digital signals between the facsimile transceiver and the
> computer without the need for a modem at the computer interface,
> in accordance with the [specification] ... and Fig. 2G.

Infinity0024250

(Remarks filed on September 26, 2002 in App. No. 08/669,056 at page 8.)  The applicant

noted that some of the claims were directed to the above transfer of *digital* signals

"without the need for a modem," whereas other claims were directed to the transfer of

*analog* signals "always to an existing computer modem":

> In contrast [to Perkins], the Applicant has defined within his
> Specification, as noted above a method of transferring digital
> signals between the facsimile transceiver and the computer which
> is very different from Perkins.  And most significantly lists many
> claims which do not require a modem at the computer to send or
> receive data for scanning or printing as does Perkins with his card
> or device 3.
>
> In claims where the Applicant transfers an analog signal, it is
> always to an existing computer modem either external or internal
> to the computer … whereas Perkins because of his design must
> provide a modem as part of his card or device 3.

(*Id*. at page 11.)  Thus, the applicant distinguished between the transfer of "digital

signals" in some embodiments and the transfer of "analog signals" in other

embodiments, and specifically linked the use of analog signals to the use of a modem.

The applicant cited FIGS. 2*f,* 2*g* and 2*h* in the continuation-in-part '056

application for support for the digital embodiments, and particularly cited FIG. 2*g* as

showing the transfer of digital signals "without the need for a modem at the computer

interface."  Each of these figures shows that the facsimile machine 30 is connected to the

PC-type computer 40 via an RS-232 cable without a modem at the computer interface.

Infinity0024251

By contrast, each of FIGS. 2*a*–2*e* includes a modem at the computer interface, and shows

that the facsimile machine 30 is connected to the PC-type computer 40 via an RJ-11

telephone cable and facsimile modem circuitry 41 internal (FIGS. 2*a*–2*d*) or external

(FIG. 2*e*) to the computer.  Thus, these figures show the transfer of *analog* signals from

the facsimile machine "to an existing computer modem."

    The applicant reinforced in the same continuation-in-part '056 application that a

modem is used for the transmission of *analog* signals.  See, e.g., the remarks filed on

November 19, 2004 at page 11 (describing that digital signals in the facsimile machine

are sent to a modem "where modulation merges the digital serial data with an analog

tone data carrier wave," resulting in an "analog carrier wave signal [output]" that "is

transmitted to the computer modem … where it is demodulated") and at page 12

(describing the operation of the modems and that "[the] carrier wave is an analog signal

and does not change the format or image content of the digital serial data that is in

effect 'riding' on top of the carrier wave").

    Consistent with the transfer of *analog* signals over the RJ-11 telephone cable

versus the transfer of *digital* signals over the RS-232 cable, the applicant distinguished

between analog and digital "connectors" or "connector ports."  The applicant argued,

for example:

Infinity0024252

> Perkins' device 3 must convert a digital signal into an analog signal, which passes through a PSTN (Public [Switched] Telephone Network) type connector, in order to be received by the facsimile transceiver. … At no time does Perkins state that the facsimile transceiver is configured with a connector suitable for the receipt or transfer of digital signals, such as an RS 232 connector. … In fact Perkins specifically states that the facsimile transceiver is equipped with a PSTN connector which necessarily means that the connector receives or transfers an analog signal, not a digital signal. … As noted earlier, connector 4 is a PSTN type connector which accepts standard analog transmission signals not digital signals.

(Remarks filed on May 23, 2002 in App. No. 08/669,056 at pages 8-9.)

> The Applicant integrates his circuit 10 with the existing control/modem circuitry of the facsimile transceiver in order to establish a digital connection and to transfer non-intercepted digital signals through RS 232 or parallel connector type ports between the facsimile transceiver and the computer.   (See the Applicant's [specification] … and Fig. 2G.)  The Applicant does not require any intervening circuitry to demodulate or module the transmitted signals as does Perkins.

(*Id*. at page 10.)  FIG. 2*g* shows an RS-232 connector in the facsimile machine 30.  In the

response filed on September 26, 2002, the applicant argued:

> Perkins' card when installed in a computer would, because of its design, use a PSTN type connector, as defined by Perkins to connect the computer to the facsimile machine.   This type of connection can only transfer an analog signal (not a digital signal), as the discussion herein details.

(Remarks filed on September 26, 2002 in App. No. 08/669,056 at pages 7-8.)

Infinity0024253

Thus, the applicant distinguished between *digital* connectors (e.g., RS-232), such as illustrated in FIGS. 2*f*, 2*g* and 2*h*, and *analog* connectors (e.g., PSTN or RJ-11 telephone connectors), such as illustrated in FIGS. 2*a*–2*e*.  The applicant further stated in the same continuation-in-part '056 application that "digital port connectors" include USB ports, serial ports (i.e., RS-232) and parallel ports (i.e., IEEE 1284), as opposed to connections "associated with a telephone line."  See the remarks filed on May 23, 2003 at page 4.

In summary, the continuation-in-part '056 application filed on June 26, 1996 discloses transmission of "digital signals" to and from the facsimile machine in one set of embodiments (FIGS. 2*f*, 2*g* and 2*h*) and transmission of "analog signals" to and from the facsimile machine in another set of embodiments (FIGS. 2*a*–2*e*).  However, the parent '278 application, filed on April 11, 1994, discloses only the analog embodiments. None of the digital embodiments is part of the originally filed disclosure of the '278 application.

The patent owner argued in the instant proceeding that the '278 application does support the transmission of "digital signals" between the facsimile machine and the computer, relying on (1) the declaration of Dr. Marc E. Levitt filed on November 12, 2014 ("the Levitt declaration"), and (2) the written description in the '278 application that the facsimile machine "may be either a group I, group II, or group III machine"

Infinity0024254

('558 patent at column 5, lines 17-20), with the computer including "either an internal or

external group III facsimile interface board" ('558 patent at column 4, lines 59-65).

With respect to (1) the Levitt declaration, the patent owner argued that the '278

application "contains a full disclosure of transmitting or receiving digital signals

through at least the disclosure of sending digital data between the facsimile machine

and the computer that is modulated onto a carrier and communicated over an RJ-11

telephone cable," pointing to FIGS. 2*b*–2*d* and citing the Levitt declaration at ¶¶ 18-24.

See the remarks filed on November 12, 2014 at page 6.  However, the examiner

determined that such arguments were contrary to the interpretation advanced in the

continuation-in-part '056 application that the digital data is modulated by the modem

and communicated over the RJ-11 telephone cable as an *analog* signal; the examiner

further noted that the Levitt declaration conflates the terms "digital signals" and

"digital data," contrary to the principle that the *data* is distinct from the *signals* by which

the data is communicated.  See the Levitt declaration at ¶ 19 ("digital signals or data

being sent or received"), ¶ 20 ("binary signals, aka digital signals/data"), ¶ 21 ("digital

signals or digital data"), ¶ 22 ("digital signals/data") and ¶ 23 ("digital signals/data").

With respect to (2) the description in the '278 application of "either a group I,

group II, or group III machine," the patent owner argued that a facsimile machine

designated as "Group III" (or "Group 3") is inherently capable of transmissions

Infinity0024255

according to ITU-T Recommendations T.4 and T.30.  From there, the patent owner

noted that ITU-T Recommendations T.4 and T.30 define facsimile transmissions over

both the General Switched Telephone Network (GSTN) and the Integrated Services

Digital Network (ISDN), and argued that Group 3 facsimile machines "were capable of

communicating either analog or digital signals."  The patent owner argued that

facsimile transmissions *in ISDN mode* would include the transmission of digital signals

over the RJ-11 telephone cable "using the same RJ-11 connector … as a digital

connector," and that because the modem disclosed in the '278 application is not

expressly limited "it can also be an ISDN modem."  See the remarks filed on April 13,

2015 at pages 9-11.

Then, based on ISDN interface standards (e.g., ITU-T Recommendations V.120,

I.411 and I.430), the patent owner proffered an annotated version of FIG. 2*e* "annotated

to reflect Group 3, ISDN elements."  While FIG. 2*e* shows that the modem is external to

the computer and is connected via an RS-232 cable, the facsimile machine still

communicates with the modem over an RJ-11 telephone cable.  The patent owner

argued that FIG. 2*e* "supports all modes of the Group 3 specification" and is "capable of

either using the RJ-11 connectors as analog connector ports facilitating the use of analog

signals or using the RJ-11 connectors as digital connector ports facilitating the use of

digital signals."  The patent owner asserted that FIG. 2*e* shows the transmission of

Infinity0024256

digital signals over the RJ-11 telephone cable between the facsimile machine 30 and the

external facsimile modem circuity 41 when the modem is "in ISDN mode" or "digital

transmission mode."  See the remarks filed on June 24, 2015 at pages 4-11.

However, the examiner determined that there is no disclosure in the '278

application of transmissions "in ISDN mode" and no disclosure of a digital modem,

ISDN or otherwise.  The examiner determined that a person of ordinary skill in the art

at the time of the invention would have interpreted the modem disclosed in the '278

application as an *analog* modem, consistent with the interpretation advanced in the

continuation-in-part '056 application.  As further evidence, the examiner cited the *PC*

*Magazine Encyclopedia* definition of the term "modem," which states that the term

"referred mostly to an analog modem" at the time the '278 application was filed in 1994

and "until the late 1990s."

The examiner pointed out that the issue is written description support, not

enablement, and that the *capability* of a Group 3 facsimile machine to communicate

"either analog or digital signals" does not mean that there is written description

support in the '278 application for both implementations.  As noted above, the written

description requirement is separate and distinct from the enablement requirement.  See

MPEP § 2161(II).  The '278 application does not show that the applicant was in

possession of a digital implementation; while the continuation-in-part '056 application

Infinity0024257

contemplates a digital interface, such as ISDN, ADSL or HDSL interface 60 "for digital

signal processing" (see the '811 patent at FIG. 2*h* and column 7, lines 1-14), there is no

disclosure of such an interface in the '278 application.

The examiner further noted that the applicant concluded in the continuation-in-

part '056 application that the specification of the parent '278 application, together with

knowledge of the ITU-T standards, merely would have rendered facsimile

transmissions over a digital connector port *obvious* to those of ordinary skill in the art:

> The CIP parent application, serial number 08/226,278 filed April 11,
> 1994, showed the application of scanning and printing by use of a
> "bi-directional direct connection via a passive link, between a
> [Group] III facsimile machine and a computer," in Figures 2b, 2c,
> and 2d, of the specification.  Thereafter, it would have been obvious
> and common knowledge to one skilled in the art with an
> understanding of the ITU standard, and as shown in the 08/226,278
> parent application in Figure 2e, to use other "digital connector
> ports," and interfaces such as, RS 232, or IEEE1284, between a
> [Group] III facsimile machine and a computer.

(Remarks filed on November 19, 2004 in App. No. 08/669,056 at page 15.)  An analogous

conclusion is echoed in the Levitt declaration:

> [The '558 patent] states on col. 7 lines 31-35, "A latitude of
> modification, change and substitution is intended in the foregoing
> disclosure, and in some instances, some features of the invention
> will be employed without a corresponding use of other features."
> So combining as a fax manufacturer an integrated interface circuit
> that communicated via an RS-232 port with Hayes-compatible AT
> commands would have been obvious to one skilled in the art after

Infinity0024258

> reading [the '558 patent], i.e. merging Fig. 2c and 2e, and was
> disclosed and described in [the '558 patent].

(Levitt declaration at ¶ 46.)  However, "[a] description which renders obvious the

invention for which an earlier filing date is sought is not sufficient."  *Lockwood*, 41

USPQ2d at 1966.  An embodiment "merging" FIGS. 2*c* and 2*e* is disclosed in the

continuation-in-part '056 application (e.g., FIGS. 2*f*, 2*g* and 2*h*) but *not* in the parent '278

application.

The subject matter added to the continuation-in-part '056 application relating to

the transmission of "digital signals" to and from the facsimile machine, such as

transmissions over a "digital connector port," includes FIGS. 2*f*, 2*g* and 2*h* and the

corresponding description.  As noted above, each of these figures shows that the

facsimile machine 30 communicates with the PC-type computer 40 over an RS-232 cable

without a modem at the computer interface.  With respect to FIG. 2*f*, for example, the

continuation-in-part '056 application describes:

> FIG. 2*f* shows an arrangement in which interface circuit 10 is
> internal to the facsimile machine.  PC-type computer 40 is coupled
> to the facsimile modem circuitry 41 and interface circuit 10 through
> an RS-232 cable. … The arrangement of FIG. 2*f* is used with PCs
> which do not have a fax modem installed.

('811 patent at column 6, lines 51-63.)  With respect to FIG. 2*h*, illustrating the ISDN,

ADSL or HDSL interface 60, the continuation-in-part '056 application describes:

Infinity0024259

> The present invention may be employed with telephone systems
> having digital signal processing.  FIG. 2*h*, which is similar to FIG.
> 2*f*, and which shows like circuits designated with like numerals,
> further includes an interface 60 for digital signal processing.  The
> send and receive options required for scanning and printing are
> provided by interface 60, which may, for example, be a chip set …
> manufactured by Siemens.   Any other chip set having similar
> operating characteristics may be employed.  As other digital signal
> formats come into use, such as ADSL (Asymmetric Digital
> Subscriber Line), HDSL (High Bit Rate Digital Subscriber Line), or
> the like, a chip set for handling such formats may be substituted for
> interface 60.

('811 patent at column 7, lines 1-14.)  With respect to FIG. 2*g*, illustrating the RS-232

connector in the facsimile machine 30, the continuation-in-part '056 application

describes:

> The provision of the scan and print functions internal to the
> facsimile machine may also be accomplished by utilizing the analog
> output of the optical scanning circuit 75 of the facsimile machine
> (FIG. 2*g*).  The analog signals are processed by the control/modem
> circuitry 76 where they are converted into a digital serial signal and
> then transmitted through the RS 232 sending interconnect port, the
> signal is then received by an RS232 connector at the PC.  The
> aforementioned procedure utilizes unused signal lines which are
> available on most modem chips such as the Rockwell chip series. …
> This linkage method for scanning and printing utilizing a fax
> machine is particularly useful for a computer without a fax modem.

('811 patent at column 8, lines 4-24.)  However, none of these embodiments is disclosed

or contemplated in the parent '278 application.

Infinity0024260

Accordingly, with respect to claims 1-5, 7-11, 14, 16, 19 and 20 of the '811 patent under reexamination, the following limitations construed to cover the transmission of "digital signals" to and from the facsimile machine, such as transmissions over a "digital connector port," are not supported in the originally filed disclosure of the '278 application:

Claims 1 and 20 recite that "digital data signals" are transmitted between the facsimile machine and the computer. Similarly, claim 7 recites "digital data" transferred between the facsimile machine and the computer. Both of these terms are interpreted as *data* encoded as a *digital signal*, as distinct from data which has been converted by a digital-to-analog converter (e.g., a modem) into an analog signal.

Claim 19 recites that "digital image signals" are transferred in both directions between the facsimile machine and the computer. This term is interpreted as *image data* encoded as a *digital signal*, as distinct from image data which has been converted by a digital-to-analog converter (e.g., a modem) into an analog signal.

Claim 14 recites "parallel data transmission" between the facsimile machine and the personal computer. This term is interpreted as *data* encoded as a *digital signal* and communicated in *parallel*, as distinct from serial communication and from data converted by a digital-to-analog converter (e.g., a modem) into an analog signal.

Infinity0024261

Application/Control Number: 90/013,208                                    Page 20
Art Unit: 3992

Similarly, claim 16 recites "analog, serial or parallel data transmission" between

the facsimile machine and the personal computer.  This limitation is interpreted as a set

of alternatives consisting of analog transmission, serial transmission and parallel

transmission; the language of the claim suggests that serial transmission and parallel

transmission are alternatives to analog transmission (i.e., transmission of analog

signals), and therefore that each is a form of digital transmission (i.e., transmission of

digital signals).

Claims 7 and 20 recite the use of a "digital connector port" on both the facsimile

machine and the personal computer.  This term is interpreted as a *port used for digital*

*communication,* as opposed to a port used for analog communication (i.e., analog

signals).  The RS-232 connector (port) illustrated in Figure 2g of the '811 patent is an

example.

With respect to the term "parallel" such as recited in claims 14 and 16, the

examiner notes that over the course of prosecution of the continuation-in-part '056

application, the applicant specifically construed the term "parallel" to relate to the

transmission of digital signals.  See, e.g., the remarks filed on May 23, 2002 at page 10

(describing a "digital connection" for the transfer of "digital signals through RS 232 or

parallel connector type ports"); the remarks filed on May 23, 2003 at page 4 (describing

"digital port connectors such as, but not limited to, a USB, a serial port (i.e. RS232), a

Infinity0024262

parallel port (i.e. IEEE1284)"); and the remarks filed on November 19, 2004 at page 15

(arguing that "digital transmission connectivity includes RS 232, IEEE1284, and other

types of digital transmission connectivity and associated digital connector ports," and

arguing that "it would have been obvious and common knowledge to one skilled in the

art … to use other digital connector ports, and interfaces such as, RS 232, or IEEE1284,

between a [Group 3] facsimile machine and a computer").  The examiner further notes

that the only disclosure of "parallel" in the '278 application relates to the windings W1

and W2 of the step-up transformer TR1.  See the '558 patent at FIG. 1 and column 4,

lines 2-21.


The appellant presents four arguments in the brief as to why the rejections

should be reversed.  These arguments are addressed in turn below.


Section VI.F.1 of Appellant's Brief

Regarding the appellant's argument that the Levitt declaration demonstrates that

an ordinary artisan would have understood the '278 application to provide written

description support for the transmission of digital signals between the computer and

the facsimile machine (see the appellant's brief at pages 14-18), the examiner

respectfully disagrees.

Infinity0024263

First, the examiner reiterates the discussion above with respect to the distinction

between digital *signals* and digital *data*.  Second, the examiner notes that the Levitt

declaration and the arguments presented in connection with the declaration were

addressed in the final Office action mailed on February 11, 2015.

In summary, the Levitt declaration conflates the terms "digital signals" and

"digital data," and asserts that the transmission of (binary coded) digital *data* over an

RJ-11 telephone cable, such as illustrated in FIGS. 2*a*–2*e*, should be interpreted as

providing written description support for the claimed transfer of digital *signals* between

the computer and facsimile machine.

Upon consideration of the entirety of the record, however, the examiner has

accorded the Levitt declaration little weight, since such an interpretation contradicts the

applicant's arguments previously presented during prosecution of the continuation-in-

part '056 application that Perkins uses a modem and therefore transfers digital data via

*analog* signals, thus failing to teach the claimed transfer of digital signals between the

facsimile machine and the computer.

Section VI.F.2 of Appellant's Brief

Regarding the appellant's argument that the disclosure of the use of a Group 3

facsimile machine is sufficient to provide written description support for the claimed

Infinity0024264

transfer of digital signals between the computer and facsimile machine (see the

appellant's brief at pages 18-24), the examiner respectfully disagrees.

The examiner notes that while Group 3 facsimile standards do include provisions

supporting the transmission of digital signals over an ISDN (i.e., digital)

communications network, the applicant's disclosure that the invention can be used with

a Group 1, Group 2, or Group 3 facsimile machine, taken in context of the remaining

disclosure of the '278 application, the disclosure of the continuation-in-part '056

application, and the arguments presented during prosecution of the applications and

the corresponding reexamination proceedings, fails to provide written description

support for the claimed transfer of digital signals between the facsimile machine and

the computer.

The appellant cites portions of ITU-T Recommendation T.30 and the EIA/TIA-578

standard as allegedly supporting the claimed transfer of digital signals, noting that they

provide for a digital document facsimile apparatus supporting the transmission of

digitized documents (see EIA/TIA-578 at sections 1.1 and 1.2), and because they support

binary coded signaling for facsimile transmission (see ITU-T Recommendation T.30 at

sections v, vi and vii of the Introduction, as well as Annex C).

However, the examiner points out that in section 5 of the T.30 standard,

disclosing the details of the binary coded signaling capabilities, it is noted that by

Infinity0024265

default, the binary coded signaling is accomplished through the use of analog signals

transmitted over a general switched telephone network through the use of a modem:

> Except as otherwise noted, the binary coded control procedures
> should be transmitted in a synchronous mode on the general
> switched telephone network at 300 bits per second ± 0.01% utilizing
> the characteristics of the Recommendation V.21 channel No. 2
> modulation system.   For the tolerances, see 3/V.21.   Signal
> generators should have a distortion not exceeding 1% and the
> control signal receivers should accept signals with a distortion not
> exceeding 40%.

(ITU-T Recommendation T.30 at page 19.)  Note that ITU-T Recommendation V.21

defines data communications utilizing analog modems over the general switched

telephone network, meaning that support for binary coded signaling refers to the use of

digital data, but not digital signals.

The examiner acknowledges that the T.30 standard does indeed support

operation via digital signals over a public digital network, as defined in Annex C.  See,

e.g., ITU-T Recommendation T.30 at page 20 ("For Group 3 machines, a capability to

operate over public digital networks is provided as a standardised option.  This

procedure is defined in Annex C.").  Annex C of the T.30 standard in turn discloses

procedures "for Group 3 document facsimile transmission on the Integrated Services

Digital Network," or ISDN.  *Id.* at page 87.

Application/Control Number: 90/013,208                                              Page 25
Art Unit: 3992

     However, although the '278 application discloses the use of a Group 3 facsimile

machine (as well as a Group 2 or Group 1 facsimile machine), there was no disclosure of

the use of a digital communications network (such as ISDN) or a digital connector port

in the facsimile machine until the filing of the continuation-in-part '056 application.

Specifically, as noted above, the later-filed '056 application describes:

> The present invention may be employed with telephone systems
> having digital signal processing.  FIG. 2*h*, which is similar to FIG.
> 2*f*, and which shows like circuits designated with like numerals,
> further includes an interface 60 for digital signal processing.  The
> send and receive options required for scanning and printing are
> provided by interface 60, which may, for example, be a chip set …
> manufactured by Siemens.  Any other chip set having similar
> operating characteristics may be employed.  As other digital signal
> formats come into use, such as ADSL (Asymmetric Digital
> Subscriber Line), HDSL (High Bit Rate Digital Subscriber Line), or
> the like, a chip set for handling such formats may be substituted for
> interface 60.

('811 patent at column 7, lines 1-14.)  The interface 60 is labeled in FIG. 2*h* as an "ISDN,

ADSL, [or] HDSL Interface" 60.

     Thus, to the extent that the '056 application discloses operating "in ISDN mode,"

the specification clearly distinguishes between the embodiment of FIG. 2*h*, which

"further includes [the] interface 60 for digital signal processing," and the embodiment

of FIG. 2*f*, which includes facsimile modem circuitry 41 but does *not* include the

interface 60:

Infinity0024267

Application/Control Number: 90/013,208                                          Page 26
Art Unit: 3992

> The present invention may be employed with telephone systems
> having digital signal processing.  FIG. 2*h*, which is similar to FIG.
> 2*f*, and which shows like circuits designated with like numerals,
> <u>further includes an interface 60 for digital signal processing</u>.

(*Id*. at lines 1-5; emphasis added.)

Likewise, the embodiment of FIG. 2*e* (part of both the '056 application and the

'278 application) includes the facsimile modem circuitry 41 but does not include the

interface 60.  A person of ordinary skill in the art would conclude that the interface 60 is

necessary for operating the devices "in ISDN mode" or "in digital transmission mode."

However, the "ISDN, ADSL, [or] HDSL Interface" 60 shown in FIG. 2*h*, as well as the

"digital signal processing" first disclosed in the '056 application, were *not* disclosed in

the '278 application.

Further support for the examiner's position is found in the *PC Magazine*

*Encyclopedia* definition of the term "modem," as noted above, as well as in the 1996 book

*How Networks Work* by Frank J. Derfler Jr. et al.  The book provides a drawing on pages

42-43 illustrating the transmission of digital data between a computer and a modem

over an RS-232C connection, and the transmission of that data embedded in an analog

signal over a conventional telephone line, analogous to the embodiment illustrated in

Figure 2*e* of the '811 patent under reexamination:

Infinity0024268

Application/Control Number: 90/013,208        Page 27
Art Unit: 3992

# A Modem Connection



Connection to telephone line

**3** The modem at the host computer converts the received audio tones back to RS-232C pulses, which are then sent to the host computer.

Modem

Digital RS-232C signal

Host computer

Infinity0024269



Note that the above drawing, published in 1996, explicitly shows the

transmission of digital data between the computer and the modem via digital signals

Infinity0024270

Application/Control Number: 90/013,208                                    Page 29
Art Unit: 3992

over an RS-232C connection, and the subsequent transmission of the digital data via

*analog* signals over telephone company lines.  The drawing illustrates that an ordinary

artisan at the time of the invention would have interpreted the appellant's disclosed

transmission of data between a facsimile machine and a computer through the use of a

modem and an RJ-11 telephone cable, such as illustrated in Figures 2*a*–2*e* of the '278

application, as supporting only the transmission of analog signals, and not digital

signals.

        Section VI.F.3 of Appellant's Brief

        Regarding the appellant's suggestion that there was agreement in the instant

proceeding that FIG. 2*e* "maps to an ISDN, i.e., digital, configuration" and is "what was

disclosed in the '278 application" (see the appellant's brief at pages 24-25), the examiner

points out that what was agreed to was the veracity of the patent owner's annotated

version of FIG. 2*e* for a *hypothetical* ISDN configuration; the examiner was in agreement

with the patent owner's explanation of how FIG. 2*e* *would* map to an ISDN

configuration, but determined that there is no written description support in the '278

application for such an implementation.

        Section VI.F.4 of Appellant's Brief

Infinity0024271

Regarding the appellant's argument that the arguments presented during prosecution of the '056 application with respect to the Perkins reference are not inconsistent with the arguments in the instant proceeding that the disclosure of the '278 application supports the claimed transfer of digital signals between the facsimile machine and the computer through the use of a digital connector port (see the appellant's brief at pages 25-32), the examiner respectfully disagrees.

The examiner's reasoning and rationale for finding that the arguments in the instant proceeding conflict with those presented during prosecution of the continuation-in-part '056 application and over the course of the corresponding reexamination proceedings is well developed, and has been reiterated at length above.

Moreover, at the same time the appellant argues that Perkins teaches an "analog-only connection" and "employed only analog connectivity (and not digital)" (see the appellant's brief at page 23), the examiner notes that Perkins in fact references the same ITU-T (formerly CCITT) Recommendations T.4 and T.30 cited by the appellant as evidence that the disclosure of a "Group 3" facsimile machine in the '278 application inherently supports both analog *and* digital connectivity between the facsimile machine and the computer.  See, e.g., Perkins at column 2, lines 11-12 (describing the "CCITT Recommendations T.4 and T.30 which govern facsimile telecommunications") and at column 6, lines 44-45 (describing the "CCITT Recommendations T.4 and T.30 governing

Infinity0024272

facsimile communication"). It is unclear how the '278 application's disclosure of the use

of Group 3 facsimile machines (which incorporate ITU-T Recommendations T.4 and

T.30) could be deemed to inherently support the claimed transfer of digital signals

between the facsimile machine and the computer, while Perkins' disclosure of the same

Recommendations T.4 and T.30 would be limited to only analog signals, and yet this is

what is argued by the appellant.

In summary, while the disclosed use of a Group 3 facsimile machine supports the

fact that it was *possible* for the system disclosed to perform the claimed step of

transferring digital signals between the computer and facsimile machine, the

prosecution history of the patent at issue and the related patents and reexamination

proceedings fails to provide written description support in the '278 application for such

an embodiment.

Specifically, the original '278 application included no disclosure of the use of

"digital signals," and no mention of the use of an ISDN (i.e., digital) communications

network. Each of the embodiments disclosed therein, illustrated in Figures 2*a*–2*e*,

includes the use of "fax modem circuitry" either as part of the computer, or as part of

the communications interface between the facsimile machine and the computer.

Infinity0024273

The '056 application, a continuation-in-part of the original '278 application, for

the first time disclosed an embodiment that supports the use of "digital signals" (see the

'811 patent at column 7, lines 1-14) through the use of an ISDN (i.e., digital)

communications network (see ISDN Interface 60 in FIG. 2*h* of the '811 patent).

During prosecution of the continuation-in-part '056 application, in rebutting

claim rejections based upon the Perkins reference, the applicant presented arguments

that while Perkins transmitted analog signals through the use of a modem, the claimed

invention transmitted digital signals and had no need for a modem.  See particularly the

applicant's response filed on September 26, 2002, in part reciting that:

> In addition, Perkins' device 3 or card design requires a modem to be
> integrated into it in order to transfer signals for scanning or printing
> as part of his computer and facsimile transceiver interface.   In
> contrast, the Applicant can transfer digital signals between the
> facsimile transceiver and the computer without the need for a
> modem at the computer interface ….

(Remarks filed on September 26, 2002 in App. No. 08/669,056 at page 8.)

> The following is a list of claims provided by the Applicant which
> do not require a fax modem at the computer, see (claims 27, 29, 32,
> 33, 35, 36, 40, 43, 44, 45, 47, 52, 53, and 54).   In addition, the
> applicant's Patent Application shows that a modem is not required
> at the computer in Figures 2F, 2G, and 2H.

(*Id*. at page 9.)

Application/Control Number: 90/013,208                                         Page 33
Art Unit: 3992

Later during prosecution of the '056 application, when rebutting a rejection

based upon prior art that predated the actual filing date of the '056 application, but not

that of the '278 application, the applicant argued instead that the claimed digital signals

and digital connectors were supported by the disclosure of the '278 application, thus

predating the cited prior art.  In doing so, the applicant argued that the modems

disclosed in Figures 2*b*–2*d* supported digital signals, because the analog signal

transmitted by the modem is merely a "carrier wave" that does not change the format

or image content of the digital data that is in effect "riding" on top of the carrier wave

(see the remarks filed on November 19, 2004 at page 12).

During the instant reexamination proceeding, the patent owner, citing

paragraphs 18-22 of the Levitt declaration, reiterated the argument that the <u>analog</u>

<u>transmission of digital data</u> (such as image data transmitted via a modem) disclosed in

the '278 application should be interpreted as inherently supporting the claimed transfer

of digital signals between the facsimile machine and the computer (see the remarks filed

on November 12, 2014 at page 6).  The patent owner in fact made this point very explicit

at the conclusion of the argument:

> Again, to unwind the confusion created by the Request, the '278
> application teaches analog *transmission* of digital *data*.  See, Levitt
> Declaration at ¶ 18-22.

(Remarks filed on November 12, 2014 at page 6).

Infinity0024275

Application/Control Number: 90/013,208                                    Page 34
Art Unit: 3992

When the examiner took the position that the signals transmitted by the modem

are in fact <u>analog signals, and not digital signals</u>, patent owner then argued that the

modems illustrated in Figures 2*a*–2*e* (the only drawings having a priority date that

would antedate the applied prior art) were in fact ISDN modems, and that the RJ-11

telephone line in fact represented an ISDN (i.e., digital) network (see the remarks filed

on June 24, 2015).

In conclusion, and taking into consideration the originally filed disclosure of the

'278 application, the arguments presented during prosecution of that application, other

applications of the patent family, and the associated reexamination proceedings, there is

insufficient written description support in the '278 application under 35 U.S.C. § 112,

first paragraph, for the claimed transfer of digital signals between the facsimile machine

and computer through the use of a digital connector port.

<u>Section VI.G of Appellant's Brief</u>

The examiner submits that each of the rejected claims of the '811 patent is

entitled only to the June 26, 1996 filing date of the continuation-in-part '056 application,

and therefore that the Kenmochi reference is eligible as "prior art" under 35 U.S.C. §

102(e).

Infinity0024276

Application/Control Number: 90/013,208                                      Page 35

Art Unit: 3992

Accordingly, claims 1, 2, 4, 7, 8, 10, 16, 19, and 20 are properly rejected under 35

U.S.C. § 102(e) as anticipated by Kenmochi.

Section VI.H of Appellant's Brief

The examiner submits that each of the rejected claims of the '811 patent is

entitled only to the June 26, 1996 filing date of the continuation-in-part '056 application,

and therefore that the Kenmochi reference is eligible as "prior art" under 35 U.S.C. §

102(e).

Accordingly, claims 3, 5, 9, 11, and 14 are properly rejected under 35 U.S.C. §

103(a) as unpatentable over Kenmochi in view of Kochis '458.

Section VI.I of Appellant's Brief

The examiner submits that each of the rejected claims of the '811 patent is

entitled only to the June 26, 1996 filing date of the continuation-in-part '056 application,

and therefore that the Kenmochi reference is eligible as "prior art" under 35 U.S.C. §

102(e).

Accordingly, claims 7, 8, 10, 16, and 19 are properly rejected under 35 U.S.C. §

103(a) as unpatentable over Kenmochi in view of Chang.

Infinity0024277

Section VI.J of Appellant's Brief

The examiner submits that each of the rejected claims of the '811 patent is

entitled only to the June 26, 1996 filing date of the continuation-in-part '056 application,

and therefore that the Kenmochi reference is eligible as "prior art" under 35 U.S.C. §

102(e).

Accordingly, claims 9, 11, and 14 are properly rejected under 35 U.S.C. § 103(a) as

unpatentable over Kenmochi in view of Chang and Kochis '458.

Infinity0024278

Application/Control Number: 90/013,208                                      Page 37
Art Unit: 3992

    For the above reasons, it is believed that the rejections should be sustained.


    Respectfully submitted,

    /Luke S. Wassum/
    Primary Examiner, Art Unit 3992


    Conferees:

    /Michael J. Yigdall/
    Primary Examiner, Art Unit 3992

    /ALEXANDER KOSOWSKI/
    Supervisory Patent Examiner, Art Unit 3992




**Requirement to pay appeal forwarding fee:**  In order to avoid dismissal of the instant

appeal in any application or *ex parte* reexamination proceeding, 37 CFR 41.45 requires

payment of an appeal forwarding fee within the time permitted by 37 CFR 41.45(a),

unless appellant had timely paid the fee for filing a brief required by 37 CFR 41.20(b) in

effect on March 18, 2013.


lsw
2 December 2015

Infinity0024279

| *Notice of References Cited* | Application/Control No.<br>90/013,208 | Applicant(s)/Patent Under Reexamination<br>6894811 | |
|---|---|---|---|
| | Examiner<br>Luke S. Wassum | Art Unit<br>3992 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| | A | US- | | | | |
| | B | US- | | | | |
| | C | US- | | | | |
| | D | US- | | | | |
| | E | US- | | | | |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Frank J. Derfler, Jr. et al., "How Networks Work," Ziff-Davis Press, 1996, pp. 40-43 and 58-61. |
| | V | ITU-T Recommendation V.21 (11/88), "300 Bits Per Second Duplex Modem Standardized for Use in the General Switched Telephone Network," 1993. |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20151130

Infinity0024280

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 90013208 | 6894811 |
| | **Certificate Date** | **Certificate Number** |
| | | |

| Requester Correspondence Address: | ☐ **Patent Owner** | ☒ **Third Party** |
|---|---|---|

ROPES & GRAY LLP
IPRM - FLOOR 43
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600

| **LITIGATION REVIEW** ☒ | /lsw/ (examiner initials) | 05/20/2014 (date) |
|---|---|---|
| Case Name | | Director Initials |
| Infinity v. Oki Data 2:12cv6797 (closed) | | |
| Infinity v. Samsung 2:12cv6798 (closed) | | |
| Infinity v. Lexmark 2:12cv6799 (closed) | | |
| Infinity v. Canon 2:12cv6800 (closed) | | |
| Infinity v. Eastman Kodak 2:12cv6801 (closed) | | |
| Infinity v. Konica Minolta 2:12cv6802 (closed) | | |
| Infinity v. Panasonic 2:12cv6803 (closed) | | |
| Infinity v. Xerox 2:12cv6804 (closed) | | |
| Infinity v. Hewlett-Packard 2:12cv6805 (closed) | | |
| Infinity v. Epson 2:126806 (closed) | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office

DOC. CODE **RXFILJKT**

Infinity0024281

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 90013208 | 6894811 |
| | **Certificate Date** | **Certificate Number** |

| **LITIGATION REVIEW** ☒ | /lsw/ (examiner initials) | 05/20/2014 (date) |
|---|---|---|
| Case Name | | Director Initials |
| Infinity v. Ricoh 2:12cv6807 (closed) | | |
| Infinity v. Dell 2:12cv6808 (closed) | | |
| Infinity v. Toshiba 2:12cv6796 (closed) | | |
| Infinity v. Brother 2:10cv3175 (closed) | | |

| COPENDING OFFICE PROCEEDINGS | |
|---|---|
| **TYPE OF PROCEEDING** | **NUMBER** |
| | |
| | |
| | |
| | |

U.S. Patent and Trademark Office

DOC. CODE **RXFILJKT**

Infinity0024282



INTERNATIONAL  TELECOMMUNICATION  UNION

# ITU-T                                              V.21

TELECOMMUNICATION
STANDARDIZATION SECTOR
OF  ITU

## DATA  COMMUNICATION
## OVER  THE  TELEPHONE  NETWORK

---

## 300  BITS  PER  SECOND  DUPLEX  MODEM STANDARDIZED  FOR  USE  IN  THE  GENERAL SWITCHED  TELEPHONE  NETWORK

### ITU-T  Recommendation  V.21

(Extract from the *Blue Book*)

---

Infinity0024283

## NOTES

1        ITU-T Recommendation V.21 was published in Fascicle VIII.1 of the *Blue Book*. This file is an extract from the *Blue Book*. While the presentation and layout of the text might be slightly different from the *Blue Book* version, the contents of the file are identical to the *Blue Book* version and copyright conditions remain unchanged (see below).

2        In this Recommendation, the expression "Administration" is used for conciseness to indicate both a telecommunication administration and a recognized operating agency.

© ITU  1988, 1993

All rights reserved. No part of this publication may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying and microfilm, without permission in writing from the ITU.

Infinity0024284

**Recommendation V.21**

## 300 BITS PER SECOND DUPLEX MODEM STANDARDIZED FOR USE IN THE GENERAL SWITCHED TELEPHONE NETWORK[1]

*(Geneva, 1964; amended at Mar del Plata, 1968,*
*and at Geneva, 1972, 1976 and 1980,*
*and at Malaga-Torremolinos, 1984)*

*Note* - The modem, designed for use on connections set up by switching in the general telephone network, can obviously be used on leased lines.

A system of data transmission at a low data signalling rate, such that data could be transmitted over a telephone circuit operated alternatively for telephone calls and data transmissions, using simple input/output equipment and easy operating procedures, would be economical.

The data signalling rate must be such as to allow the use of current types of data sources and sinks, especially electromechanical devices.

The system for data transmission will be duplex, either for simultaneous two-way data transmission or for the transmission of signals sent in the backward direction for error-control purposes. The transmission must be such that use can be made of normal telephone circuits, and this applies both to the bandwidth available and to the restrictions imposed by signalling in the telephone networks.

The two correspondents are brought into contact by a telephone call, and the circuit is put into the data-transmission position:

    a)    manually by agreement between the operators, or

    b)    automatically.

For these reasons, the CCITT

*unanimously declares the following view*

**1**      Data transmission may take place at low data signalling rates on telephone calls set up on switched telephone circuits (or on leased telephone circuits).

**2**      The communication circuit for data transmission is a duplex circuit whereby data transmission in both directions simultaneously is possible at 300 bit/s or less.

The modulation is a binary modulation obtained by frequency shift, resulting in a modulation rate being equal to the data signalling rate.

*Note* - Attention is drawn to the fact that there may be in operation some old-type V.21 modems for which the maximum data signalling rate is 200 bit/s.

**3**      For channel No. 1, the nominal mean frequency is 1080 Hz.

For channel No. 2, it is 1750 Hz.

The frequency deviation is ± 100 Hz. In each channel, the higher characteristic frequency ($F_A$) corresponds to a binary 0.

---

[1]  See Note under § 2 of this Recommendation.

Infinity0024285

The characteristic frequencies[2] as measured at the modulator output must not differ by more than ± 6 Hz from the nominal figures.

A maximum drift frequency of ± 6 Hz is assumed for the line. Hence the demodulation equipment must tolerate drifts of ± 12 Hz between the frequencies received and their nominal values.

**4**  Data may be transmitted by synchronous or asynchronous procedures. With synchronous operation, the modem will not have to provide the signals which would be necessary to maintain synchronism when transmission is not proceeding.

**5**  When echo control device disabling is required, it is recommended that the procedures specified in Recommendation V.25 be followed.

**6**  The maximum power output of the modem into the line shall not exceed 1 mW.

The power level of the modem should be adjusted to make allowance for loss between this equipment and the point of entry to an international circuit, so that the corresponding nominal level of the signal at the international circuit input shall not exceed - 13 dBm0 (see Recommendation V.2, § 2).

**7**  a) When both channels are used for simultaneous both-way data transmission, channel No. 1 is used for transmission of the caller's data (i.e. the person making the telephone call) towards the called station, while channel No. 2 is used for transmission in the other direction.

  b) When one channel is used for data transmission and the other is used for transmission of check signals, service signals, etc., only, it is channel No. 1 which is used for transmission from the calling to the called station regardless of the direction in which the data are transmitted.

  c) The procedure for the assignment of the channels described under a) and b) above applies in the case of the general service of data transmission, making it possible to transmit data or check signal, service signal, etc., bilaterally between any two subscribers. In special cases which do not come under this rule, the procedure of assignment of the channels is determined by the prior agreement between the correspondents, bearing in mind the requirement proper to each service.

## 8  Interchange circuits

8.1  *List of interchange circuits essential for the modems when used on the general switched telephone network or non switched leased telephone circuits (see Table 1 /V.21)*

The configurations of interchange circuits are those essential for the particular switched network or leased circuit requirement indicated. Where one or more of such requirements are provided in a modem, then all of the appropriate interchange circuit facilities should be provided.

---

[2]The nominal characteristic frequencies;

channel No. 1 ($F_A$ = 1180 Hz and $F_Z$ = 980 Hz);

channel No. 2 ($F_A$ = 1850 Hz and $F_Z$ = 1650 Hz).

Infinity0024286

TABLE 1/V.21

| Interchange circuit | | General switched telephone network including terminals equipped for manual calling, | Non-switched leased telephone circuits (Note 1) | |
| --- | --- | --- | --- | --- |
| Number | Designation | manual answering, automatic calling, automatic answering (Note 1) | Point-to-point | Multipoint |
| 102 | Signal ground or common return | X | X | X |
| 103 | Transmitted data | X | X | X |
| 104 | Received data | X | X | X |
| 105 | Request to send | - | X (Note 2) | X |
| 106 | Ready for sending | X | X | X |
| 107 | Data set ready | X | X | X |
| 108/1 | Connect data set to line | X (Note 3) | X | X |
| 108/2 | Data terminal ready | X (Note 3) | X (Note 4) | - |
| 109 | Data channel received line signal detector | X | X | X |
| 125 | Calling indicator | X | - | - |
| 126 | Select transmit frequency | - | - | X |

*Note 1* - All essential interchange circuits and any others which are provided shall comply with the functional and operational requirements of Recommendation V.24. All interchange circuits indicated by X shall be properly terminated in the data terminal equipment and in the data circuit-terminating equipment in accordance with the appropriate Recommendation for electrical characteristics (see § 9).

*Note 2* - Circuit 105 is not required when alternate voice/data service is used on non-switched leased point-to-point circuits.

*Note 3* - The circuit shall be capable of operation as circuit 108/1 - *connect data set to line* or circuit 108/2 - *data terminal ready* depending on its use.

*Note 4* - In the leased point-to-point case, where alternate voice/data service is to be provided, circuit 108/2 may be used optionally.

8.2      *Response times of circuits 106 and 109*

8.2.1     *Definitions*

8.2.1.1     Circuit 109 response times are the times that elapse between the connection or removal of a tone to or from the modem receive line terminals and the appearance of the corresponding ON or OFF condition on circuit 109.

The test tone should have a frequency corresponding to the characteristic frequency of binary 1 and be derived from a source with an impedance equal to the nominal input impedance of the modem under test.

The level of the test tone should fall into the level range between 1 dB above the actual threshold, of the received line signal detector and the maximum admissible level of the received signal. At all levels within this range the measured response times shall be within the specified limits.

8.2.1.2     Circuit 106 response times are the times from the connection of an ON or OFF condition on:

-     circuit 105 (where it is provided) to the appearance of the corresponding OFF or ON condition on circuit 106;

-     circuit 109 (where circuit 105 is not provided) to the appearance of the corresponding ON or OFF condition on circuit 106.

Infinity0024287

8.2.2     *Response times*

TABLE 2/V.21

| Circuit 106 | | |
|---|---|---|
| OFF to ON | 20-50 ms (see Note 1) | 400-1000 ms (see Note 2) |
| ON to OFF | | $\leq 2ms$ |
| Circuit 109 | | |
| OFF to ON | $\leq 20$ ms (see Note 1) | 300-700 ms (see Note 2) |
| ON to OFF | | 20-80 ms |

*Note 1* - These times are used on leased point-to-point networks without alternate voice data facilities and on leased multipoint facilities.

*Note 2* - These times are used in the general switched network service and on leased point-to-point circuits with alternate voice data.

8.3     *Threshold of data channel received line signal detector*

Level of received line signal at received line signal terminals of modem for all types of connection, i.e. general switched telephone network or non-switched leased telephone circuit:

greater than   -43 dBm          circuit 109 ON

less than       -48 dBm          circuit 109 OFF

The condition of circuit 109 for levels between -43 dBm and -48 dBm is not specified except that the signal detector shall exhibit a hysteresis action such that the level at which the OFF to ON transition occurs shall be at least 2 dB greater than for the ON to OFF transition.

Where transmission conditions are known on switched or leased circuits, Administrations should be permitted at the time of modem installation to change these response levels of the received line signal detector to less sensitive values (e.g. -33 dBm and -38 dBm respectively).

8.4     *Fault condition of interchange circuits*

See Recommendation V.28, § 7 for association of the receiver failure detection types).

8.4.1     The DTE should interpret a fault condition on circuit 107 as an OFF condition using failure detection type 1.

8.4.2     The DCE should interpret a fault condition on circuits 105 and 108 as an OFF condition using failure detection type 1.

8.4.3     All other circuits not referred to above may use failure detection type 0 or 1.

## 9     Electrical characteristics of interchange circuits

Use of electrical characteristics conforming to Recommendation V.28 is recommended together with the connector and pin assignment plan specified by ISO 2110.

Infinity0024288

*Note* - Manufacturers may wish to note that the long-term objective is to replace electrical characteristics specified in Recommendation V.28, and that Study Group XVII has agreed that the work shall proceed to develop a more efficient, all-balanced, interface for the V-Series application which minimises the number of interchange circuits.

10      The following information is provided to assist equipment manufacturers:

a)      The nominal range of attenuations in subscriber-to-subscriber connections is from 5 to 30 dB at the reference frequency (800 or 1000 Hz), assuming up to 35 dB attenuation at the frequency 1750 Hz.

b)      The data modem should have no adjustment for send level or receive sensitivity under the control of the operator.

**Reference**

[1]      CCITT Recommendation *Echo suppressors,* Vol. III, Rec. G.164.

Infinity0024289



3 0402 00149 2000

# HOW
# NETWORKS
# WORK

**BESTSELLER EDITION**

**NATIONAL · BESTSELLER**

**Take an intriguing visual journey inside the PC network**

—discover how each component works its magic and how it all fits together.

**Part of the Best-selling How It Works Series**

## FRANK J. DERFLER, JR., AND LES FREED

*Illustrated by* Michael Troller

Infinity0024290

# How Networks Work

## Bestseller Edition

## Frank J. Derfler, Jr., and Les Freed

### Illustrated by Michael Troller



Ziff-Davis Press
An imprint of Macmillan Computer Publishing USA
Emeryville, California

Infinity0024291

| | |
|---|---|
| Series Manager | Valerie Haynes Perry |
| Copy Editors | Jan Jue and Nicole Clausing |
| Technical Reviewer | Wade Ellery |
| Project Coordinator | Madhu Prasher |
| Cover Illustration | Michael Troller |
| Cover Design | Regan Honda |
| Book Design | Carrie English and Bruce Lundquist |
| Technical Illustration | Michael Troller, Sarah Ishida, and Mina Reimer |
| Word Processing | Howard Blechman |
| Page Layout | Bruce Lundquist |
| Indexer | Carol Burbo |

Ziff-Davis Press, ZD Press, and the Ziff-Davis Press logo are trademarks or registered trademarks of, and are licensed to Macmillan Computer Publishing USA by Ziff-Davis Publishing Company, New York, New York.

Ziff-Davis Press imprint books are produced on a Macintosh computer system with the following applications: FrameMaker®, Microsoft® Word, QuarkXPress®, Adobe Illustrator®, Adobe Photoshop®, Adobe Streamline™, MacLink®Plus, Aldus® FreeHand™, Collage Plus™.

Ziff-Davis Press, an imprint of
Macmillan Computer Publishing USA
5903 Christie Avenue
Emeryville, CA 94608
510-601-2000

Copyright © 1993 and 1996 by Macmillan Computer Publishing USA. All rights reserved.

How Networks Work, Bestseller Edition
Published 1993. Second Edition 1996.

PART OF A CONTINUING SERIES

All other product names and services identified throughout this book are trademarks or registered trademarks of their respective companies. They are used throughout this book in editorial fashion only and for the benefit of such companies. No such uses, or the use of any trade name, is intended to convey endorsement or other affiliation with the book.

No part of this publication may be reproduced in any form, or stored in a database or retrieval system, or transmitted or distributed in any form by any means, electronic, mechanical photocopying, recording, or otherwise, without the prior written permission of Macmillan Computer Publishing USA, except as permitted by the Copyright Act of 1976, and except that program listings may be entered, stored, and executed in a computer system.

THE INFORMATION AND MATERIAL CONTAINED IN THIS BOOK ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY CONCERNING THE ACCURACY, ADEQUACY, OR COMPLETENESS OF SUCH INFORMATION OR MATERIAL OR THE RESULTS TO BE OBTAINED FROM USING SUCH INFORMATION OR MATERIAL. NEITHER MACMILLAN COMPUTER PUBLISHING USA NOR THE AUTHOR SHALL BE RESPONSIBLE FOR ANY CLAIMS ATTRIBUTABLE TO ERRORS, OMISSIONS, OR OTHER INACCURACIES IN THE INFORMATION OR MATERIAL CONTAINED IN THIS BOOK, AND IN NO EVENT SHALL MACMILLAN COMPUTER PUBLISHING USA OR THE AUTHOR BE LIABLE FOR DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF SUCH INFORMATION OR MATERIAL.

ISBN 1-56276-376-8

Manufactured in the United States of America

10 9 8 7 6

Infinity0024292

Introduction                                          ix

# Part 1: Communicating By Wire                        1

Chapter 1
The Telegraph                                          4

Chapter 2
The Telephone                                          10

Chapter 3
Printing Telegraphs                                   14

# Part 2: Mixing Computers and Telephones             20

Chapter 4
The Early Networks                                    24

Chapter 5
From Keypunches to Terminals to the
Carterfone                                            28

Chapter 6
Alphabet Soup: Morse, Baudot, ASCII, and
EBCDIC                                                36

Chapter 7
The Bell 103 Modem                                    40

Chapter 8
Dialing for Data                                      44

Chapter 9
The RS-232C Serial Interface                          48

Chapter 10
The Personal Computer as a Terminal                   52

Chapter 11
Smart Modems                                          58

Chapter 12
The Fax Modem                                         62

Chapter 13
Computer Telephony Integration                        66

# Part 3: Local Area Networks (LANs)                  70

Chapter 14
A Network Model                                       76

Chapter 15
Network Operating Systems                             80

Infinity0024293

Chapter 16
The Network Interface Card                86

Chapter 17
Network Cabling                           92

Chapter 18
Server-Based LANs                         116

Chapter 19
Peer-to-Peer Networks                     120

Chapter 20
Enterprise Network Systems                124

Chapter 21
Remote LAN Access                         130

Chapter 22
Network Security                          134

**Part 4: Links Between LANs                    140**

Chapter 23
Repeaters, Bridges, Routers, and
Switches                                  144

Chapter 24
Metropolitan Area Networks (MANs)   148

Chapter 25
Circuit-Switched Digital Services         152

Chapter 26
Packet-Switching Networks                 158

**Part 5: Workgroup Applications                166**

Chapter 27
Online Information Services               170

Chapter 28
Electronic-Mail Systems                   174

Chapter 29
Beyond Electronic Mail: Groupware for
Productivity                              180

Chapter 30
The Internet                              184

Index                                     190

Infinity0024294

Case 1:18-cv-00468-LPS   Document 148-23   Filed 12/10/18   Page 55 of 62 PageID #: 2938

CHAPTER

# 7

# The Bell 103 Modem



Infinity0024295

**THE** early electronic communications devices—the telegraph and teletypewriter—communicated with one another by exchanging pulsed direct current (DC) signals over a long wire. Modern-day computers and terminals use an improved version of this technique, as defined by the RS-232C and other computer communications standards.

Telephones, in contrast, communicate by passing an analog audio signal over the line. The strength and frequency of the signal varies depending on the volume and pitch of the sound being sent. Because the telephone network is designed to carry voice signals, it cannot carry the DC signals used in computer communications.

As the use of computers spread in the late 1950s and early 1960s, a need arose to connect computers and terminals via ordinary telephone lines. AT&T's answer was the Bell 103 modem. A modem (that is, a *modulator/demodulator*) converts the on-and-off digital pulses of computer data into on-and-off analog tones that can be transmitted over a normal telephone circuit.

The Bell 103 modem operated at a speed of 300 bits per second. This is painfully slow by modern-day standards, but it was fast enough for the slow-printing terminals of the day. Because it allowed the terminal to be physically separated from the host computer, the modem made computing resources available from virtually anyplace.

Recent improvements in modem technology allow speeds up to 57,600 bits per second, 192 times the speed of the original Bell 103 modem. As we'll see in Chapter 11, these modems use microprocessors to achieve these high communications speeds. Ironically, some newer modems contain more computing power than many early mainframe computer systems!

Regardless of the communications speed, all modems share some common characteristics. Since they must connect to a computer or terminal, virtually all modems contain an RS-232C communications interface. Similarly, most modems also contain an RJ-11 telephone-line interface—the familiar clear plastic four-wire telephone plug.

The Bell 103 modem uses two pairs of tones to represent the on-and-off states of the RS-232C data line. One pair of tones is used by the modem originating the call, and the other pair is used by the modem answering the call. The modem sends data by switching between the two tones in each pair. The calling modem sends data by switching between 1,070 and 1,270 hertz, and the answering modem sends data by switching between 2,025 and 2,225 hertz.

Newer modems use more and different tones to convey information, but the basic principle remains the same.

Infinity0024296

# A Modem Connection



RS-232C connection to terminal

Connection to telephone line

**3** The modem at the host computer converts the received audio tones back to RS-232C pulses, which are then sent to the host computer.

Modem

Digital RS-232C signal

Host computer

Infinity0024297



Data from host to terminal

Data from terminal to host

1 This remote terminal is connected via modem to a host mainframe computer. The terminal is connected to the on-line modem via an RS-232C connection. The terminal sends data to the modem on pin 2 of the RS-232C plug, and receives data from the modem on pin 3.

Modem

Remote terminal

2 The modem converts the on-and-off pulses of the RS-232C data to modulated audio tones.

Connection to telephone line

Telephone company lines

Analog audio tones

Infinity0024298

CHAPTER

# 11

# Smart Modems



Infinity0024299

As we saw earlier in this book, modems connect the digital universe of computers to the analog world of the telephone network. The earliest modems designed by Bell Labs operated at a maximum speed of 300 bits per second. Almost as soon as the first modems went into service, users began clamoring for faster, more reliable modems. The clamor continues today.

The next step up from the 300bps Bell 103 modem was another AT&T product, the Bell 212a modem. This modem operated at 1,200 bits per second, or four times the speed of the earlier 103 unit. Although the higher operating speed was a big improvement, the 212a units were very susceptible to noise and signal degradation on the telephone circuit.

Before the Bell system breakup in 1984, AT&T set virtually all modem standards. Bell Labs' engineers designed new modems, and AT&T's Western Electric division manufactured them. Bell licensed the 103 and 212a technology to other companies, but, with few exceptions, all new modem designs came from AT&T. After the breakup, AT&T was no longer in a position to dictate standards to the rest of the industry.

The Bell breakup coincided with the boom years in personal computer growth. By 1984, the personal computer industry was in the midst of a period of phenomenal growth, which began with the introduction of the IBM Personal Computer in late 1981. The personal computer explosion, coupled with the Bell breakup, presented some unique business opportunities for America's modem manufacturers.

One company in particular, Hayes Microcomputer Products, took the lead in the personal computer modem business. Hayes pioneered the use of microprocessor chips inside the modem itself. Unlike other modems, the Hayes unit could take the phone line off hook, wait for a dial tone, and dial a telephone number all by itself.

Like most innovations in the computer industry, the Hayes modem was quickly and mercilessly copied by other modem makers. But Hayes was there first, and it holds one of the key patents relating to intelligent modems.

The next major advance in modem technology was the development of the 2,400 bits-per-second modem in 1985. Until 1985, most modem technical standards had come from AT&T's Bell Labs. The 2,400bps standard was created by the CCITT—an industry standards-setting organization comprising members from hundreds of telecommunications companies worldwide. The new modem standard—designated V.22bis—was widely accepted and is still in use today.

The CCITT—now called the International Telecommunication Union-Telecommunication sector (ITU-T)—continues to mediate industry standards for modems. Newer ITU-T standards include V.32 (9,600bps), V.32bis (14,400bps), V.34 (28,800bps), V.42 (error control), and V.42bis (data compression). Virtually all modems in use today conform to one or more ITU-T standards, assuring compatibility between modems worldwide.

Infinity0024300

# Inside a Modem

Here's a peek under the hood of a typical 9,600bps modem. The modem has four major areas: power supply, subscriber interface, CPU, and modem circuitry.

The modem chip performs the complex two-way conversion between digital signals and analog sound signals. Without this chip, the modem circuitry would require thousands of additional transistors and other electronic components.

Like any computer, the modem's CPU circuitry requires a steady, regulated source of power. The on-board power-supply circuitry converts the AC power provided by the power transformer into regulated DC power.

Infinity0024301

The central processing unit, or CPU, is the heart of the modem. The CPU controls virtually every other component of the modem and performs the data compression and error detection specified by the CCITT protocols. The CPU's program loads from two ROM chips and uses two 64K RAM chips for temporary storage.

The analog side of the modem begins with the subscriber-line interface, which connects to the telephone network. Overload circuitry protects the modem from lightning and other electrical hazards. Additional circuitry ensures that the modem's output signal conforms to the FCC Part 68 rules.

The RS-232C interface connects the modem to a terminal or a computer that issues the commands received through the RS-232C port. Intelligent modems can store and dial telephone numbers automatically.

Infinity0024302