# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | § | |
| INFINITY COMPUTER PRODUCTS, INC., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 18-463-LPS-CJB |
| | § | |
| OKI DATA AMERICAS, INC., | § | |
| *Defendant.* | § | |
| | § | |

## PLAINTIFF INFINITY COMPUTER PRODUCTS INC.'S
## <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

William J. Rhodunda, Jr. (No. 2744)
Chandra J. Williams (No. 4907)
Rhodunda, Williams & Kondraschow
Brandywine Plaza West
1521 Concord Pike, Suite 205
Wilmington, DE 19803
Telephone: (302) 576-2000
Facsimile:  (302) 576-2004
bill@rawlaw.com
chandra@rawlaw.com

Andrew G. DiNovo (admitted *pro hac vice*)
Nicole E. Glauser (admitted *pro hac vice*)
Gabriel R. Gervey (admitted *pro hac vice*)
DiNovo Price LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile:  (512) 539-2627
adinovo@dinovoprice.com
nglauser@dinovoprice.com
ggervey@dinovoprice.com

***Counsel for Plaintiff***
***Infinity Computer Products Inc.***

**Table of Contents**

I.    INTRODUCTION ................................................................................................. 4

II.   BACKGROUND OF THE PATENTS-IN-SUIT ............................................................ 5

    A.  Technical Overview .............................................................................. 5

    B.  RS232 Serial Communications ............................................................ 8

    C.  Digital Communication Drivers .......................................................... 9

    D.  The Extensive Examination of the Patents-in-Suit ............................. 10

III.  APPLICABLE LAW ........................................................................................... 11

    A.  Claim Construction ............................................................................ 11

    B.  Validity and The Definiteness Requirement ...................................... 12

IV.  INFINITY'S CLAIM CONSTRUCTION POSITIONS ............................................... 13

    A.  Level of Ordinary Skill and Date of Invention .................................. 13

    B.  The "Facsimile Machine" Terms ....................................................... 13

    C.  "Passive Link" .................................................................................... 17

    D.  "Computer" ......................................................................................... 20

V.   CONCLUSION .................................................................................................... 22

## Table of Authorities

**Cases**

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) .................................................................... 12

*Bell Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
   132 F.3d 701 (Fed. Cir. 1998) ..................................................................... 11

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
   783 F.3d 1374 (Fed. Cir. 2015) .................................................................... 12

*Carnegie Steel Co. v. Cambria Iron Co.*,
   185 U.S. 403 (1902).................................................................................... 12

*CIAS, Inc. v. Alliance Gaming Corp.*,
   504 F.3d 1356 (Fed. Cir. 2007) .................................................................... 15

*Graham v. John Deere Co.*,
   383 U.S. 1, 33 (1966).................................................................................. 11

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) ........................................................... 4, 11, 16

*Johnson & Johnston Assoc. Inc. v. R.E. Serv. Co.*,
   285 F.3d 1046, 62 USPQ2d 1225 (Fed. Cir. 2002) ........................................... 4

*Lemelson v. Gen. Mills, Inc.*,
   968 F.2d 1202 (Fed. Cir. 1992) .................................................................... 11

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ............................. 11, 12

*Microsoft Corp. v. Multi-Tech Sys. Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) .................................................................... 11

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998) .................................................................... 11

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S.Ct. 2120 (2014)................................................................................. 12

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005) .................................................................... 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 4, 11, 14, 16

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
   753 F.3d 1291 (Fed. Cir. 2014) .................................................................... 13

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
   733 F. App'x 1011  (Fed. Cir. 2018) ......................................................... 17, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ................................................................................................. 4

Pursuant to the Court's Scheduling Order of June 11, 2018 (Case No. 18-463-LPS, Doc. No. 107), Plaintiff Infinity Computer Products, Inc. ("Infinity" or "Plaintiff") hereby files this its Opening Claim Construction Brief, and in support thereof, state as follows:

## I.     INTRODUCTION

As this Court is well aware, claims in each asserted patent set forth the metes and bounds of the claimed inventions.  It is the claims that place the public on notice of the scope of the patentee's right to exclude. *See, e.g., Johnson & Johnston Assoc. Inc. v. R.E. Serv. Co*., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc).  Two consistent themes throughout this process are: (1) Oki Data asserting a term is indefinite where none of Infinity, the U.S. Patent Office, the PTAB or even their codefendants agree; and (2) Oki Data seeks to import limitations from characterizations of specific examples in the specification to improperly narrow the scope of the claim terms.  But, "the words of a claim 'are generally given their ordinary and customary meaning' ... that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims. *Id.* at 1323.

Where Oki Data seeks to confine terms to a particular embodiment, it is improper to do so; the claim language itself is paramount. *See, e.g., Innogenetics*, 512 F.3d at 1363, 1370.  Its attempt to re-write the claim language by importing limitations from the specification is improper. *See Phillips*, 415 F.3d at 1323 (holding that while claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims).

The Patents-in-Suit have been repeatedly examined by the United States Patent & Trademark Office.  The dialogue with the Patent Office over the course of many years has resulted

in substantial exposition as to the meaning of many of the claim phrases described below. Moreover, the Patents-in-Suit have been vetted to an extraordinary degree.  As set forth in this memorandum, the statements made during the course of prosecution, both originally and during reexamination, directly support Infinity's proposed constructions.

## II.     BACKGROUND OF THE PATENTS-IN-SUIT

### A.     Technical Overview

Plaintiff has asserted that Defendant Oki Data infringes multiple claims of U.S. Patent Nos. 6,894,811 (the "'811 patent"); 7,489,423 (the "'423 patent"); 8,040,574 (the "'574 patent"); and U.S. Patent No. 8,294,915 (the "'915 patent").  The '811, '423, '574, and '915 patents are collectively referred to as the "Patents-In-Suit," and are attached hereto as **Exhibits 1-4**.

Infinity is a pioneering company whose former technical lead, Mr. Bruce Nachman, now deceased, was the named inventor of the Patents-in-Suit.  Infinity commercially released breakthrough products that allowed a single scanner and printhead to be leveraged for multiple functions.  Infinity is now operated by Mr. Marv Nachman, the father of Bruce Nachman.  The Patents-in-Suit teach an integrated system for communications between a facsimile machine and a PC in order to transfer scan and print data.  This teaching corresponds to the primary features of modern fax-based multi-function printers, or "MFPs," also known as "All in One's."

Bruce Nachman's advancement represented a breakthrough at the time of the invention: he recognized that the consolidation of a facsimile machine with generally distinct scan and printing capability using generic communication protocols was possible, thereby obviating the need for many separate devices.   He did this by providing a bidirectional direct connection, for scan or print data flow, via a passive digital link between a facsimile machine and a PC.  When in this mode the data flow bypasses or is isolated from the telephone line.  At the time of the invention, most PCs were typically delivered with installed Windows or Apple operating system send receive

generic communication software. Optionally, this generic software could be added to the PCs. The '558 Patent specification teaches using a group 1, 2, or 3 facsimile machine and analog and/or digital transmission for sending scan or print data between the facsimile machine and the PC. This method was made possible through the realization that standard fax machines based on emerging digital facsimile transmission standards could share data formats common to the data communications employed by personal computers. Accordingly, the invention adopts generic communications protocols between the facsimile machine and the computer for the transfer of data for the purposes of printing and scanning with the facsimile machine.



**Fig. 2g**

In particular, as shown in the '811 patent in Fig. 2g, a Group 3 facsimile machine is connected via a bidirectional RS 232 digital passive link for transmission of scan and print data with a PC using generic send receive communication software, which is representative of a typical MFP today.

The '558 Patent specification teaches the use of digital connectivity with Group 3 facsimile machines, and PCs, in accordance with ITU recommendations T.4, T.6 and T.30. This is further substantiated in Dr. Marc Levitt's Declaration, attached. Group 3 Facsimile machines were developed for sending digitized documents over the General Switched Telephone Network (GSTN). These facsimile terminals are now in widespread use around the world. The operation of Group 3 Facsimile terminals has been standardized in ITU-T Recommendations T.4, T.6 and T.30.

The parent application to the Patents-in-Suit resulted in U.S. Patent No. 5,530,558, (the "'558 patent"), which is directed to a particular embodiment of the invention that was manufactured and sold by Infinity. The '558 patent is not asserted against Oki Data, but provides a priority date for the Patents-in-Suit. In the '558 patent, Fig. 2e disclosed that the use of digital transmission, namely via RS-232, could be employed as part of the original method. Fig. 2e shows that the serial digital data that is transmitted as part of all other '558 patent arrangements could be accomplished without use of analog modulation. The '811 patent further included Fig. 2g, which illustrates another instance showing transmission of the digital serial data between the PC and the fax machine using RS-232 transmission end-to-end without use of any analog modulation. This arrangement utilized all the same elements of a direct connection, passive link and standard transmission, yet was a highly simplified arrangement without modulation where the analog call control signaling was replaced by its digital equivalent (in conjunction with RS-232).

In the '811 patent, the Fig 2g embodiment demonstrated that the native digital data could be transmitted without the overhead of complex modulated communication techniques (otherwise referred to as baseband transmission). This was another benefit of embodiments of the Nachman

invention, recognizing the common native digital data format used by both the standard facsimile machine and a standard computer.

B.     **RS232 Serial Communications**

RS232 is a form of digital serial communication.  It is repeatedly disclosed in the drawings and specification of the Patents-in-Suit.



*Fig.  2e*

'811 Patent, Fig. 2e; *see also* Figs. 2f; 2g.  As set forth in the specification, "FIG. 2e shows still another arrangement in which the PC-type computer 40 is coupled to external facsimile modem circuitry 41, for example, through an RS-232 cable."  '811 Patent, 6:38-40.

> The RS-232 interface is the Electronic Industries Association (EIA) standard for the interchange of serial binary data between two devices. It was initially developed by the EIA to standardize the connection of computers with telephone line modems. The standard allows as many as 20 signals to be defined but gives complete freedom to the user. Three wires are sufficient: send data, receive data, and signal ground. The remaining lines can be hardwired on or off permanently. The signal transmission is bipolar, requiring two voltages, from 5 to 25 volts, of opposite polarity…. The RS-232-C specifies the signaling rate between the DTE and DCE, and a digital signal is used on all interchange circuits. The RS-232 standard

specifies that logic "1" is to be sent as a voltage in the range -15 to -5 V and that logic "0" is sent as a voltage in the range +5 to +15 V.

RS-232 Recommended Standard 232C (attached as **Exhibit 5**).

C.     **Digital Communication Drivers**

WIA/STI, TWAIN and PCL are exemplary standard scan and print application interfaces for the purposes of managing image data transfers between the PC applications and the device drivers.   Levitt Decl., ¶¶34, 45.   Device drivers are low-level software used to facilitate the communications between the PC and other devices such as a fax machine.   The device drivers and low-level driver software within the standard Microsoft or Apple operating system frameworks are those which represent the generic elements referenced in the Nachman patents.

The Patents-in-Suit's "generic send/rec driver communication software" refers to the common communication elements used in certain of the asserted claims by scanning and printing applications for the transfer of image data between the PC and the fax machine.   Depending on the operating system, PC hardware and timeframe of this equipment, the actual elements representing the "generic send/rec driver comm software" have varied, although they are readily identifiable. While the term "generic send/rec driver comm software" and specifically "generic" was a point of significant discussion during reexamination to determine support in the intrinsic record, it is not the "generic send/rec driver comm software" that is the point of novelty in the Nachman patents. The Nachman patents disclose a method of which one element—driver communications software—is part of a whole group or class.   The point of novelty in the Nachman patents is the entirety of the claimed method, which is inclusive of generic communication modes.   Bruce Nachman taught that native "digital image data" could be transferred via a generic communication protocol for the purposes of printing and scanning.   The generic communication software was

disclosed in conjunction with a bi-directional direct connection via a passive link employing standard protocols for communication.

**D.      The Extensive Examination of the Patents-in-Suit**

The Pennsylvania defendants (at the time, including Oki Data) initiated three rounds of reexaminations of the Patents-in-Suit, and promptly sought a stay of the litigation pending the determination by the subject matter experts at the U.S. Patent & Trademark Office ("USPTO"). Each of the Patents-in-Suit have thus been examined by the USPTO and had their patentability repeatedly confirmed through three rounds of reexaminations, concluding on July 31, 2012; March 25, 2014; and September 20, 2016 respectively. *See, e.g.,* '811 patent, attached as **Exhibit 1**, *Ex Parte* Reexamination Certificates (found at the end of the patent document). It is rare that a litigated set of patents has been so thoroughly examined by the USPTO and the Board of Patent Appeals (the "Board" or "PTAB").

The claim construction task before the Court is thus relieved somewhat by the fact that the very same phrase put before the Court by Oki Data, "passive link," has previously been construed by the United States Patent & Trademark Office during the lengthy reexamination process.

In 2016, upon completion of the third round of reexaminations, the Board found support in the original application all of the claims in the '811, '423, '574 and '915 patent claims, without change, and stated that the '558 patent incorporated all of the teaching to support their claims. In other words, the '558 patent taught how a fax machine could be linked with the PC without modification to material aspects of the facsimile machine consistently with the claims of the Patents-in-Suit. *See, e.g.,* Figs. 2b and 2d.

## III.   APPLICABLE LAW

### A.   **Claim Construction**

Claim construction is the first step in any infringement or validity analysis. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).   A district court should construe the claims in light of their explicit language as informed by their preambles, as well as the patent's specification, figures, and prosecution history.   *See Id.* at 980; *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966).

The specification is the "best source for understanding a technical term," to be supplemented, "as needed, by the prosecution history."   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)).   The prosecution history represents key evidence of how the examiner and the inventor construed the patent.   *See Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).   Claims should generally be interpreted in a manner consistent with other claims, as well as with the prosecution history.   *See, e.g., Bell Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701 (Fed. Cir. 1998).   Moreover, claim terms in patents sharing a common specification and application should usually be given the same interpretation.   *See, e.g., NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1293 (Fed. Cir. 2005) (rehearing en banc denied); *Microsoft Corp. v. Multi-Tech Sys. Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (rehearing en banc denied).

It is improper to confine a claim to a particular embodiment; the claim language itself is paramount.   *See, e.g., Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008); *accord Phillips,* 415 F.3d at 1325 (favoring plain and ordinary meaning of the claim language over importing limitation from the preferred embodiment).   Extrinsic evidence may also be relevant to claim construction. *See Phillips,* 415 F.3d at 1317.   Such evidence consists of all evidence extrinsic to the patent and its prosecution history, including "expert and inventor testimony, dictionaries,

and learned treatises." *Id.* (internal quotation omitted).  While authorizing examination of extrinsic evidence, the Federal Circuit has warned that while it "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.*

B.   **Validity and The Definiteness Requirement**

The Supreme Court in *Nautilus, Inc. v. Biosig Instruments, Inc.* held that a patent claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  572 U.S. 898 (2014).  "Reasonable certainty" does not require "absolute or mathematical precision."  *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015).

It is important to note that patents are "not addressed to lawyers, or even to the public generally," but rather to those skilled in the relevant art.  *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 437 (1902) (also stating that "any description which is sufficient to apprise [steel manufacturers] in the language of the art of the definite feature of the invention, and to serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent").  Defendants have the burden of proving indefiniteness by clear and convincing evidence. Id. at 1377.  *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

The Supreme Court has held that a phrase in not indefinite if it is "precise enough to afford clear notice of what is claimed, [and] thereby 'apprise the public of what is still open to them.'" *Nautilus*, 134 S.Ct. at 2129 (quoting *Markman v. Westview Instruments, In*c., 517 U.S. 370, 373 (1996) (alterations omitted).  Under the standard set forth in *Nautilus*, claims are not indefinite when, viewed in light of the specification and prosecution history, they inform a person of ordinary skill about the scope of the invention with reasonable certainty.  *Id.*

## IV.   INFINITY'S CLAIM CONSTRUCTION POSITIONS

### A.   Level of Ordinary Skill and Date of Invention

Infinity contends that that the level of ordinary skill in this art at the time of filing of the Patents-in-Suit would have been someone with at least a B.S. in electrical engineering or equivalent, or at least 3 years of experience in the field of designing telecommunications systems or driver and embedded software.

### B.   The "Facsimile Machine" Terms

| Term/Phrase | Infinity's Construction | Oki Data's Construction |
|---|---|---|
| "facsimile machine" / "fax machine"<br><br>'811, cl. 1, 2, 4, 6, 7, 18-20<br>'423, cl. 1-4, 6<br>'574, cl. 1, 2, 4, 5, 7, 8<br>'915, cl. 1, 6-9, 14, 15 | No construction necessary<br><br>*or*<br><br>"a device that is capable of sending and receiving a fax, including associated scan and print functionality" | "a standard facsimile machine"<br><br>*or*<br><br>"a conventional facsimile machine" |

Oki Data's proposed construction takes a phrase and does not construe it, but instead adds one or another word to the term to be construed.  Their approach should be rejected under governing case law—adding words to the actual claim language has been repeatedly rejected by the Federal Circuit.  *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("Source added words to the actual claim language, thus changing the relevant comparison from the slot to the diameter of the rod to the slot to the diameter of the rod added to the thickness of the container folded over it.  Instead of looking to the words themselves, Source added language without support from the specification or prosecution history, altering otherwise unambiguous claim language, a practice this court has repeatedly rejected.").

The *Vagabond* holding is a logical corollary from *Phillips*, which holds that claims are normally given their plain and ordinary meaning.

> We have frequently stated that the words of a claim "are generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582; *see also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. *See Innova*, 381 F.3d at 1116.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  The customary meaning of "facsimile machine" is consistent with Infinity's proposal.  See Declaration of Dr. Marc E. Levitt dated September 28, 2018, ¶¶ 50-55 (attached as **Exhibit 6**).  Tellingly, the only two technical witnesses deposed of co-defendant Epson (which was co-pending in the Eastern District of Pennsylvania for 6 years and transferred to C.D. Cal. in February 2018), testified consistently with Infinity's position, not that of Oki Data.  Each of those individuals exceeds the criteria for a person of ordinary skill, both having engineering degrees and over two years (in fact, over ten years) in the multifunction business.  *See* **Exhibits 7 and 8** (Arabian Trans., 28:9-13; Williams Trans, 9:4-7; 126:7-127:25).  Both testified that a facsimile machine is simply a device that is capable of sending a receiving a fax.  *See* **Exhibits 7 and 8** (Arabian Trans., 28:9-13; Williams Trans, 16:20-17:4).

Oki Data's presumed basis for modifying the language of the claim—that the specification sometimes describes a "standard" or "conventional" fax machine—answers itself.  Whereas the specification at times refers to a standard or conventional facsimile machine, the claim terms includes neither "standard" nor "conventional."  To the extent those phrases form part of the asserted claims (e.g., generic send/receive driver communication software), they are addressed elsewhere in the claim.  Moreover, nothing about the term "facsimile machine" precludes the addition of additional capabilities—indeed, that is the essence of many of the asserted claims, allowing scanning and printing to/from a connected computer.  Oki Data's multifunction devices

14

infringe if they meet the elements of the patent claim, even if additional elements are added. Black letter patent law provides that the addition of elements to an infringing core *does not negate* infringement. *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (infringing device may include additional, unrecited elements).

Embodiments of the invention encompass specific modifications to a standard fax machine. For example, in Fig. 2c, a fax machine is modified with the addition of interfacing circuit **10**.



*Fig. 2c*

'811 Patent, Fig. 2c. The specification explains, "Fig. 2c shows another alternative arrangement in which the circuitry **10** of the present invention is integrated into the standard facsimile machine **30**," thus generating a *modified* facsimile machine. In Fig. 2g, a "standard fax machine" is even further modified to include control circuitry and line driver internal to fax modem with auto tone detection functions **76** and RS232 digital connector.



**Fig. 2g**

In Fig. 2h, ISDN, ADSL and HDSL interface **60** is also added to the further modified device.

While Oki Data seeks to confine this term to a particular embodiment, it is improper to do so; the claim language itself is paramount. *See, e.g., Innogenetics*, 512 F.3d at 1363, 1370. Defendant's attempt to re-write the claim language by importing limitations from the specification is improper. *See Phillips*, 41 5 F.3d at 1323 (holding that while claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims).

C.     **"Passive Link"**

| Term/Phrase | Infinity's Construction | Oki Data's Construction |
|---|---|---|
| "passive link"<br><br>'811, cl. 1, 6, 7, 18-20<br>'423, cl. 1, 2, 6<br>'574, cl. 1, 7, 8<br>'915, cl. 1, 9 | No construction necessary<br><br>*or*<br><br>"a link where the initiation of data flow is activated from a setup procedure within the PC and/or the facsimile machine, and the data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine, for purposes of providing scanning and/or printing data" | Indefinite.<br><br>Alternatively, "a link where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine" |

The term "passive" is well known in the electronic arts, and needs no construction.  In addition, the PTAB has already determined the meaning of "passive link" in the context of the reexamination of the Patents-in-Suit, construed the term and implicitly found that the term was not indefinite.  "It is presumed that public officials do their assigned jobs." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990); *accord Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1019 (Fed. Cir. 2018).  Plaintiff's alternative construction is adopted verbatim from the Board's language:

Turning to the claims, independent claims 1, 7, 19, and 20, recite, in pertinent part, coupling a fax machine to a computer over a bi-directional direct connection via a *passive link*. As Dr. Marc E. Levitt indicates in his Declaration filed November 12, 2014 ("Levitt Decl."), the term "passive link" is defined as:

> [O]ne where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, *with no intervening apparatus or signal interception by a processing element or any active component*, along the path of an *unbroken direct connection* between the PC and facsimile machine . . . .

July 19, 2016 Decision on Appeal reversing Examiner (re: '811 patent) at 6 (attached as Exhibit 9) (emphasis added). As can be seen, Infinity adopts the recitation on which the Board relied in Infinity's successful appeal verbatim.

The Federal Circuit places significant weight on the fact that the subject matter experts at the patent office, and in this case the Board, have scrutinized a term and not found it to be indefinite.

> The examiner's own remarks confirm that the claim language informs a person of ordinary skill of the objective boundaries of the claim term. Additionally, we presume that an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance. *See Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990) ("It is presumed that public officials do their assigned jobs").

*Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1019 (Fed. Cir. 2018) (emphasis added).

An apparently minor disagreement of the parties is the inclusion of the final clause, "for purposes of providing both scanning or printing data." The term under construction is a "passive link." The data transmitted over the passive link is not part of the construed phrase. In the context

of the asserted claims, it is not required that the "passive link" provide both scanning and printing data.

For example, '811 patent claim 1 provides:

1. A method of creating a scanning capability from a facsimile machine to a computer, with scanned image digital data signals transmitted through a bi-directional connection *via a passive link* between the facsimile machine and the computer, comprising the steps of:

   by-passing or isolating the facsimile machine and the computer from the public network telephone line;

   coupling the facsimile machine to the computer;

   conditioning the computer to receive digital facsimile signals representing data on a scanned document; and

   conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the computer, said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted digital facsimile signals being received directly into the computer through the bi-directional direct connection *via the passive link*, thereafter, said computer processing the received digital facsimile signals of the scanned document as needed.

'811 patent, claim 1 (emphasis added). In both instances in which the phrase "passive link" appears, digital data signals are passed over the passive link from the facsimile machine to the computer.

### D.    "Computer"

| Term/Phrase | Infinity's Construction | Oki Data's Construction |
|---|---|---|
| "using an unmodified standard protocol for shifting the personal computer to a connected mode"<br><br>'811, cl. 1, 2, 4, 6, 7, 18-20<br>'423, cl. 1-4, 6<br>'574, cl. 1, 2, 4, 5, 7, 8<br>'915, cl. 1, 9 | No construction necessary; not indefinite. | Indefinite. |

"Computer" is a straightforward word.  It is readily understood by a person of skill in the art, the Court and jury without construction.  It is not indefinite, and Oki Data has not explained why it believes "computer" is indefinite while codefendants Xerox Corporation, Toshiba America Business Solutions, Inc., Samsung Electronics America, Inc., Konica Minolta Business Solutions, U.S.A., Inc., HP Inc., Ricoh Americas Corporation, Dell Inc., and Epson America do not.  *See, e.g.,* **Exhibit 10** (E.D. Pa. Defendants' Preliminary Proposed Claim Constructions).

The term "computer" is not given a special definition in the patent specification, but in the context of discussing Fig. 1, the following statement supports an ordinary and broad construction: "The PC, which may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT)…" '811 Patent, 4:59-61.

The number of patents claims in which "computer" has either been construed or (more commonly) not been subject to construction are legion.  Indeed, when such a question has even been raised, courts have held that "computer" does not require construction.  *See, e.g., Portal Technologies LLC v. Yahoo! Inc.*, 2013 WL 449263, at *8 (E.D. Tex. 2013) ("The Court therefore hereby expressly rejects Defendant's proposed construction and hereby construes "computer" to have its plain meaning.")

Oki Data has not shared its concocted basis to argue that "computer" is indefinite; Infinity can only speculate.  In that vein, other similarly well-understood phrases in the computer arena have been subject to a "no construction necessary" analysis even in the face of arguably inconsistent teaching in the specification.  As noted by the Federal Circuit in one case:

> [T]here is no dispute that the terms "volatile memory" and "non-volatile memory" have a meaning that is clear, settled, and objective in content. Both parties and the district court agreed that, as a general matter, "[t]o one of ordinary skill in the art, a volatile memory is memory whose data is not maintained when the power is removed and a non-volatile memory is memory whose data is maintained when the power is removed." *Ancora,* 2012 WL 6738761, at *4. That meaning leaves the relevant public with a firm understanding of the scope of the claim terms, unless something exceptional sufficiently supplants that understanding. Apple argues that the specification does so. We conclude otherwise.
>
> Apple's argument rests on the fact that, three times, the specification uses language referring to a hard disk as an example of volatile memory. ′941 patent, col. 1, line 21; *id.,* col. 3, line 9; *id.,* col. 4, line 53. All sides agree that a hard disk maintains data when the power is removed and for that reason is not normally referred to as "volatile memory." Apple contends that because "a hard disk is a quintessential example of non-volatile memory" and "the specification does not explain *how* a hard disk can fall into the category of volatile memory ... or what characteristics differentiate volatile from non-volatile memory ... a person of ordinary skill would not know what falls within the scope of the claims." Cross–Appellant Br. at 38.
>
> We are not persuaded that Apple's conclusion is properly drawn from the passages on which it relies. To begin with, the terms at issue have so clear an ordinary meaning that a skilled artisan would not be looking for clarification in the specification. There is no facial ambiguity or obscurity in the claim term. Moreover, the specification nowhere purports to set out a definition for "volatile" or "non-volatile" memory, and nothing in it reads like a disclaimer of the clear ordinary meaning. Under our claim-construction law, a clear ordinary meaning is not properly overcome (and a relevant reader would not reasonably think it overcome) by a few passing references that do not amount to a redefinition or disclaimer.

*Ancora Technologies, Inc. v. Apple, Inc*., 744 F.3d 732, 737–38 (Fed. Cir. 2014).  "Computer" should thus be understood in accordance with its well-understood, plain and ordinary meaning.

## V.        CONCLUSION

For the foregoing reasons, in view of the patent specifications, drawings, prosecution histories and claims, and the extrinsic evidence of record in this brief and the Joint Claim Construction Statement, Infinity respectfully submits that its claim constructions should be adopted.


DATED:  December 21, 2018                           Respectfully submitted,


                                                    /s/ Chandra J. Williams
                                                    William J. Rhodunda, Jr. (No. 2744)
                                                    Chandra J. Williams (No. 4907)
                                                    Rhodunda, Williams & Kondraschow
                                                    Brandywine Plaza West
                                                    1521 Concord Pike, Suite 205
                                                    Wilmington, DE 19803
                                                    Telephone: (302) 576-2000
                                                    Facsimile:  (302) 576-2004
                                                    bill@rawlaw.com
                                                    chandra@rawlaw.com

                                                    Andrew G. DiNovo (admitted *pro hac vice*)
                                                    Nicole E. Glauser (admitted *pro hac vice*)
                                                    Gabriel R. Gervey (admitted *pro hac vice*)
                                                    DiNovo Price LLP
                                                    7000 N. MoPac Expressway, Suite 350
                                                    Austin, Texas 78731
                                                    Telephone: (512) 539-2626
                                                    Facsimile:  (512) 539-2627
                                                    adinovo@dinovoprice.com
                                                    nglauser@dinovoprice.com
                                                    ggervey@dinovoprice.com

                                                    ***Counsel for Plaintiff***
                                                    ***Infinity Computer Products Inc.***