IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INFINITY COMPUTER PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-463-LPS-CJB |
| | ) | |
| OKI DATA AMERICAS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT OKI DATA AMERICAS, INC'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

John W. Shaw (No. 3362)
Jeff Castellano (No. 4837)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
OF COUNSEL:                          1105 North Market Street, 12th Floor
Marc R. Labgold, Ph.D.               Wilmington, DE 19801
Patrick J. Hoeffner                  (302) 298-0700
NAGASHIMA HASHIMOTO & YASUKUNI       jshaw@shawkeller.com
12005 Sunrise Valley Drive, Suite 203   jcastellano@shawkeller.com
Reston, VA 20191                     arussell@shawkeller.com
(703) 901-8860                       *Attorneys for Oki Data Americas, Inc.*

Dated: December 21, 2018

# **TABLE OF CONTENTS**

Nature and Stage of the Proceedings ........................................................................... 1

Statement of Facts ...................................................................................................... 1

    I.    The Patents-In-Suit Differ from the '278 Application .................................. 1

    II.   The Applicant Changed Positions Regarding "Computer" and "Passive Link" ......... 4

        A.   To Overcome *Perkins*, the Applicant Added the "Passive Link"
            Term to Some Claims, Citing His New Embodiments ...................................... 4

            1.   The Applicant Also Distinguished *Perkins* as Requiring a Modem,
                Except as to Certain "Modem" Claims ...................................................... 5

        B.   The Applicant Later Explicitly Defined "Passive Link" .................................. 6

        C.   The Applicant Reversed His Position During Re-examination .......................... 7

   III.  The Patentee Has Consistently Tied His Invention to a Standard
       or Conventional Facsimile Machine ......................................................... 9

Argument .................................................................................................................. 10

   IV.  "Facsimile Machine" and "Fax Machine" Mean
       "Standard Facsimile Machine" or "Conventional Facsimile Machine".................. 10

        A.   The Specification Shows that the Patent is Directed to
            a Standard or Conventional Facsimile Machine ................................................ 11

        B.   Infinity's Construction Is Insupportably Broad ................................................ 12

        C.   The Patentee Tied His Claims to Standard or Conventional
            Facsimile Machines During Re-examination..................................................... 13

        D.   The Applicant Cannot Expand the Meaning of Facsimile Machine................. 13

    V.   "Passive Link" Is Indefinite ................................................................................ 15

        A.   The Applicant Took Conflicting Positions Regarding
            "No Intervening Apparatus" ............................................................................ 15

        B.   The Applicant Took Conflicting Positions Regarding
            the Endpoints of the Passive Link.................................................................... 17

    VI.  "Computer" Is Indefinite ..................................................................................... 20

Conclusion ............................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ...............................................14

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009) ................................. 14

*In re Walter*, 698 F. App'x 1022 (Fed. Cir. 2017)....................................... 19

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) .................................. 15

*Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005) .............................................. 13

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015) .......................... 1, 15, 19

*Transcend Med., Inc. v. Glaukos Corp.*, Civ. A. No. 13-830,
   2015 U.S. Dist. LEXIS 124863 (D. Del. Sep. 18, 2015)..........................................19

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) ..................... 13

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Infinity Computer Products Inc. ("Infinity") and Defendant Oki Data Americas, Inc. ("ODA") dispute the meaning of three terms:  facsimile machine, passive link, and computer. Each of these terms is present in each claim of the asserted patents, and a determination by the Court that "passive link" or "computer" are indefinite will resolve this action.

The patents-in-suit[1] issued from U.S. Patent Application No. 08/669,056, filed June 24, 1996 ("the CIP application"), or as continuations thereof.  The CIP application was a continuation-in-part of U.S. Patent Application No. 08/226278, filed April 11, 1994 (the "'278 application"). The indefiniteness issues herein arise because the applicant relied upon new matter added to the CIP application to avoid the prior art, but then reversed himself during reexamination and presented contradictory arguments in order to claim priority to the original '278 application.

## STATEMENT OF FACTS

### I.    The Patents-In-Suit Differ from the '278 Application

The '278 application describes purportedly improved methods of simulating certain elements of a telephone network between a computer and a facsimile machine to permit the facsimile machine to function as a scanner by sending a document as a facsimile ("fax") to the computer or, alternatively, to permit the facsimile machine to function as a printer by receiving a document as a fax from the computer.  (Ex. 48[2] ("'278 app."), figs. 2a-2e, 2:9-16, 10:5-11:28, 14:15-20).  The '278 application was intended to address what was recognized as a problem in the

---

[1]    The four patents-in-suit, U.S. Patent Nos. 6,894,811 ("the '811 patent"), 7,489,423 ("the '423 patent"), 8,040,574 ("the '574 patent"), and 8,294,915 ("the '915 patent") are directly related and share a common specification.  Thus, citations to the specification herein are to the '811 Patent. (D.I. 148 at ECF Exh. 1). The prosecution history for any one of the patents is relevant to all of them.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).

[2]    Exhibits 1-47 herein refer to the exhibits to the Joint Claim Chart, D.I. 148.  Exhibit numbers 48-54 refer to exhibits attached to this brief.

1

prior art: a computer cannot send or receive faxes to or from a facsimile machine on the same desk and connected by a simple telephone cable absent some hardware in-between to simulate the functions of a telephone network, and then-existing methods of doing so involved complicated and expensive hardware.[3] ('278 app., 1:5-2:26; *see Lin*, 3:22-48 (describing problem)).

The need to simulate these telephone network functions arose because fax machines and then-existing computers were designed to send and receive fax transmissions over such a network. Thus, a properly equipped computer could send a fax to a *remote* facsimile machine by calling the facsimile machine's phone number and sending the fax over the telephone network. (*See* '278 app., 13:20-14:26; *Lin*, 1:39-2:5, 10:66-11:15). Likewise, a computer could answer the telephone line when it rings in order to receive a fax. (*See* '278 app., 9:11-25). But a computer and facsimile machine sitting on the same desk and connected via a simple telephone cord could not send faxes to one another because there was nothing to generate the ring signal. (*See* '278 app., 14:27-15:3; *Lin*, 3:22-48 (describing the problem)). In other words, simply connecting the two devices together with a telephone *cord* did not work because they expected a telephone *line—i.e.*, a line on a telephone network, which handles ringing and so forth—between them. (*See Lin*, 2:52-3:48).[4]

The cited prior art reference *Lin* solved this problem by simulating the network functions and generating the ring signal using a "specially programmed controller." (Ex. 49 at 22 (Nov. 6,

---

[3]   During prosecution of the '278 application, the applicant cited United States Patent No. 4,991,200 to Lin ("*Lin*"). (Exh. 1 at 1-2 (information disclosure statement); Exh. 42 (*Lin*)). *Lin* permits a facsimile machine to send a fax to a computer on the same desk by simulating a phone network (*Lin*, 1:8-2:17, 3:41-48), and was the basis for the sole obviousness rejection during prosecution of the '278 application. (Exh. 1, Examiner's Action at 6-8 (office action regarding *Lin*)). The applicant distinguished *Lin* as being "significantly more complicated" than his invention because it required a "specially programmed controller" and other circuitry. (*See, e.g.*, Exh. 1, Remarks at 22-23).

[4]   Likewise, two telephones connected directly to each other with a phone cord cannot call each other. (*Cf. Lin*, 3:64-4:7 (describing that two telephones must go through the "central office" to connect to each other)).

1995 amendment)).  The applicant for the patents-in-suit, however, criticized the *Lin* invention and other prior art methods as being too "complicated" and "expensive."  (Ex. 49 at 22 (Nov. 6, 1995 amendment); '278 app., 2:1-7).  He described his invention as a "a circuit of highly simplified design and low cost" that did not require a "microprocessor" or the "complicated, expensive, and typically microprocessor-based circuitry" used by the prior art.  (*Id.* at 2:1-4:4; '811 patent, 1:31-2:23; *id.* at fig., 1 (circuit design); *see, e.g.*, Ex. 1, Remarks at 22-23 (applicant distinguishing *Lin*)).  The applicant asserted that this "highly simplified" circuitry could be positioned in a box in-between the computer and the facsimile machine or placed inside of either device, and would allow the devices to communicate with each other by sending and receiving faxes as if there were a phone network in-between, without requiring complicated or expensive hardware.  (*See, e.g.*, '278 app., figs. 2a-2e, 2:3-7, 14:8-24, 14:27-15:3).

During prosecution of the '278 application, the applicant filed his CIP application, which describes a different configuration.  (*See* '915 patent at 1 (describing the chain of applications)).  This CIP application gave rise to all four patents-in-suit.  (*Id.*).  The original '278 application disclosed *only* embodiments where the computer used its *own* fax modem to communicate with the *facsimile machine's* modem, and the devices were connected in various ways (*e.g.*, where the computer's modem and the applicant's circuitry were positioned either inside or outside of the computer).  (*See, e.g.*, '278 app., figs. 2a-2e).  Every embodiment involved a telephone cable connecting the devices, sometimes along with other cables.  (*See id.*).  In contrast, the new matter added in the CIP application includes figures and text describing new embodiments where *only one modem is used—i.e.*, the fax modem *inside the facsimile machine*.  ('811 patent, figs. 2f-2h, 6:51-7:13).  The computer is directly connected to the facsimile machine's modem via *only* a digital serial cable without the use of a telephone cable.  (*See, e.g.*, '811 patent, fig. 2f-2h).  This

3

distinction gives rise to the applicant's conflicting positions, which in turn render the claims indefinite.

## II.    The Applicant Changed Positions Regarding "Computer" and "Passive Link"

### A.    To Overcome *Perkins*, the Applicant Added the "Passive Link" Term to Some Claims, Citing His New Embodiments

During prosecution, the examiner rejected the relevant claims based on U.S. Patent No. 5,452,106 to Perkins.  (Ex. 39 ("*Perkins*"); Ex. 50 at 4-5).  *Perkins* describes a card mounted inside a computer that includes various components—including, *inter alia*, a fax modem—that allows the computer to send or receive faxes to or from a facsimile machine that is connected to the card via a standard telephone cord.  (*See, e.g.*, Ex. 39 at 9:29-33; Ex. 25 at 7-8 (Applicant describing *Perkins* as disclosing a "card . . . installed in a computer")).

In response to the rejection, the applicant amended some claims to require a "passive link" between the facsimile machine and the "computer."  (Ex. 25 at 7, 12).  The applicant simultaneously defined "computer" to mean the "the I/O bus of the computer" such that *Perkins*' card (located physically within the housing of the computer, but between the facsimile machine and the I/O bus of the computer) is part of that link rather than being defined as a part of the computer.  (Ex. 25 at 12).  As so defined, the applicant argued that *Perkins* therefore did not disclose a "passive link" because its card was an "intervening apparatus" between the facsimile machine and the I/O bus of the computer.  (Ex. 25 at 7, 12; *cf.* Ex. 2 at 18 (a "passive link" is "one where . . . data is transferred[] with no intervening apparatus . . . .").  The applicant then contrasted the claimed invention as follows:

> "when the Applicant transfers digital data from the facsimile transceiver through a passive link for scanning to the computer, the non intercepted data enters through the RS 232 type connector port of the computer and passes ***directly to the I/O Bus*** . . . , providing a true non intercepted digital signal . . . ."

(Ex. 25 at 12 (emphasis added)).

4

In distinguishing *Perkins*, the applicant also specifically pointed to the new embodiments added in the CIP application and shown in figures 2f, 2g, and 2h of the '811 patent.  (Ex. 25 at 9-10)).  Unlike the original embodiments shown in figures 2a-2e, these embodiments work "without a fax modem" in the computer, and transmit data without modulation directly from the computer to the facsimile machine.  ('811 patent, figs. 2f-2h, 8:22-24).

### 1. The Applicant Also Distinguished *Perkins* as Requiring a Modem, Except as to Certain "Modem" Claims

The applicant's amendments divided his claims into three sets:

(1) claims with a "passive link" between the facsimile machine and the "computer" (the "computer" claims: all claims except claim 28, 36, and 37);

(2) claims with a "passive link" between the facsimile machine and a "modem" associated with the computer (the "modem" claims: claims 28 and 37); and

(3) a claim with no "passive link" at all (claim 36).

(Ex. 25 at 17-22).  As to the "computer" claims, (*i.e.*, item (1) above), the applicant emphasized the fact that *Perkins* uses a modem at the computer, whereas the applicant's claims do not.  (*Id.* at 8-9, 12).  He argued further that

"*Perkins'* device 3 intercepts the flow of data before it is transmitted to the computer circuits, in order to convert the analog signal into a digital signal format acceptable to the computer [using a modem]."

(*Id.* at 12).  He specifically criticized *Perkins'* use of a modem at the computer end of the connection:

"*Perkins'* device 3 or card design ***requires a modem*** to be integrated into it in order to transfer signals for scanning or printing as part of his computer and facsimile transceiver interface. In contrast, the Applicant can transfer digital signals between

5

the facsimile transceiver and the computer *without the need for a modem at the computer interface*, in accordance with [the '811 patent at 8:4-26] and Fig 2G."

(*Id.* at 8-9 (emphasis added)).  Thus, the claimed subject matter was

"different from Perkins . . . most significantly [in that it] lists many claims [the "computer" claims] which do not require a modem at the computer to send or receive data for scanning or printing as does Perkins with his card or device 3."

(*Id.* at 11 (emphasis added); *see also id.* at 13 (applicant's "invention can be built for at least half the cost of the prior art, since it does not require any of the additional hardware and software that is required [by] Perkins," including a "modem")).

As to the other claims, (*i.e.*, items (2) and (3) above), the applicant distinguished *Perkins* on other grounds.  The applicant distinguished the "modem" claims, (item (2) above), not because of the passive link limitation but because those claims required that the computer have "a *pre-existing* facsimile modem," in contrast to *Perkins*' modem that was integrated into the card.  (Ex. 25 at 2, 11, 17 (emphasis added); *see also id.* at 13 (distinguishing *Perkins* on other grounds as well as to claim 28)).  The modem claims were later canceled.  (Ex. 51 at 1 (Jan. 14, 2005 Index of Claims)).  Likewise, claim 36 was distinguished on other grounds and then later amended to include the "passive link" limitation.  (Ex. 25 at 13-14; Ex. 2 at 4).

## B.  The Applicant Later Explicitly Defined "Passive Link"

In response to a later rejection over another reference ("Nakamura"), the applicant defined the claim term "passive link" to explicitly include the "no intervening apparatus" limitation discussed with regard to *Perkins*:

The Applicant's definition of a "passive link" is one where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with *no intervening apparatus* or signal interception by a processing element or any active component, along the path of an

> unbroken direct connection between the PC and the facsimile machine, for purposes
> of providing both scanning or printing data.

(Ex. 2 at 18 (emphasis added); *see id.* at 22 ("the Applicant does not require ***any*** intervening apparatus between the PC and the facsimile machine") (emphasis added)). The applicant ***repeatedly*** relied on this definition. (*See, e.g.*, Ex. 14 at 7, Ex. 17 at 12; *see also* Ex. 38 at 6 (Patent and Trademark Office ("PTO") noting the definition of "passive link"); Ex. 37 at 20-21 (examiner noting definition)). This "passive link" limitation ultimately issued in all asserted independent claims.

Thus, the applicant defined "passive link" during prosecution to exclude a data transfer between the "computer" and a facsimile machine that flows through *any* "intervening apparatus," including boards such as a modem that are installed in the computer.

## C.    The Applicant Reversed His Position During Re-examination

After the applicant brought this action, the claims of the patents-in-suit were challenged in a series of re-examinations. (*See, e.g.*, '811 patent at 23-29 (reexamination certificates)). During one of the reexamination proceedings, the claims were rejected over prior art having a priority date ***after*** the filing date of the original '278 application, prompting the patentee[5] to claim priority to that application. (*See* Ex. 52 at 5-6 (summarizing history)).

In order to do so, the patentee had to show that the original '278 application supported the claims that ultimately issued. (*Id.*). However, ***every single embodiment*** in the '278 application has an "intervening apparatus" along the path between the facsimile machine and the internal I/O bus of computer. (*See, e.g.*, '278 application figs. 2a-2e (showing, *e.g.*, a passive link to circuits "[o]n an Internal PC Card," not directly to the I/O bus); Ex. 53 at 116:9-17 (deposition testimony

---

[5]    The terms "applicant" and "patentee" are synonymous, with "patentee" used herein to refer to the applicant after the patent has issued.

of patentee's prosecution expert confirming that the modem in *e.g.* fig. 2a is installed between the computer's bus and the facsimile machine)).

In order to circumvent this impediment, the patentee ***redefined*** the term "passive link" to extend only from the facsimile machine to the *housing* (*i.e.*, external ports) of the computer, not to the I/O bus of the computer.  Specifically, the applicant argued that when he claimed a "passive link" from the facsimile machine to the "computer," that term was supported by figures 2b-2d of the original specification, because the "passive link" need exist only "on the cable between the PC's RJ-11 [port] and the fax's RJ-11 [port]":



(Ex. 33 at 7-8; Ex. 14 at 7; '811 patent, fig. 2c (emphasis added)).  For that reason, he argued, "the use of a modulation procedure ***within the PC*** and facsimile machine as shown in the figures does not insert an intervening apparatus or processing element along the path" of the passive link.  (Ex. 14 at 7 (emphasis added)).  Thus, even though figure 2d of the patent, for example, shows both an internal modem and the applicant's circuitry on "an Internal PC Card" ***just like Perkins***, the applicant argued that such a configuration was a "passive link."  In other words, the applicant argued that the "passive link" ***does not*** extend all the way to the I/O bus of the computer:



Location of the passive link to the "computer" in distinguishing *Perkins*



Location of the passive link to the "computer" during re-examination

The PTO did not address the direct conflict between the patentee's new position and his prior definitions of "computer" and "passive link" and prior arguments regarding those terms. Instead, the PTO accepted the patentee's argument except as to the claims that specifically required a "digital" passive link. (Ex. 52 (May 7, 2015 Advisory Action, at 14)).

The patentee appealed the examiner's determination that a "digital" passive link was not supported, and in doing so cited *all* of the patent's figures as disclosing a "passive link," even though some of them, such as figure 2e, show intervening circuitry even under the applicant's *new* definition of "computer" (*i.e.*, encompassing hardware installed in the housing of the computer):



('811 patent, fig. 2e (emphasis added); *see* Ex. 38 at 6-8 (noting applicant's argument regarding figure 2e); Ex. 54 at 1-9, 24-25 (applicant's appeal brief citing figure 2e)). The PTO rejected this argument "because there is an intervening component between the facsimile machine and computer, namely the modem," but permitted the claims on other grounds. (Ex. 38 at 8).

## III.  The Patentee Has Consistently Tied His Invention to a Standard or Conventional Facsimile Machine

While the patentee reversed himself in other areas, he has consistently tied his invention to the use of a standard or conventional facsimile machine. (*See, e.g.*, '811 patent, Abstract, figs. 2a-2j, 2:30-32). During re-examination, the patentee amended his claims to require that "generic" and "unmodified standard protocol" software be used on the computer. (*See* D.I. 113 at 2-6 (describing amendments)). To show that those limitations were supported by the '278 application, the patentee made multiple arguments emphasizing that the patentee's invention involves the use

9

of a standard or conventional facsimile machine.[6]   (*See, e.g.*, Ex. 10 at Infinity0009183,

Infinity0009185).   The patentee also distinguished one prior art reference cited during re-

examination, U.S. Patent No. 5,598,533 to Yokota ("*Yokota*"), on the basis that it was not a

"standard facsimile machine."   (Ex. 6 at 19-20).

**ARGUMENT**

**IV.   "Facsimile Machine" and "Fax Machine" Mean "Standard Facsimile Machine" or "Conventional Facsimile Machine"**

The premise of the purported invention is to leverage the functionalities resident on a

conventional ***facsimile machine*** so that it functions "effectively as a scanner or printer . . . and

provides a scanning or printing capability at a mere fraction of the cost of conventional scanners

or printers."   ('811 patent at 8:56-63; *see also id.* at Abstract, 1:19-55, 5:66-6:3, figs. 2a-2j).   The

core principle of the invention is that functions of a phone network are simulated so that the

computer can communicate with a local facsimile machine by sending and receiving faxes.   (*See,

e.g.*, '811 patent at 8:56-59).   During the November 20, 2018 hearing regarding ODA's intervening

rights summary judgment motion, Infinity's counsel argued that its claims have always required a

*conventional* facsimile machine:

> **All of the figures and embodiments presented in the patent <u>require</u> that the device, the fax machine be a conventional fax machine**, the PC be a standard PC, and that the communications between them be a standard protocol. Every single one of the figures.

D.I. 142 at 21:6-10 (emphasis added).   As Infinity's counsel further explained:

> The problem that the invention is attempting to address is the expense and complexity that comes with attempting to use specialized printers and the ease that

---

[6]   Infinity later repeated these arguments at the district court in arguing against ODA's intervening rights motion, as discussed below.   (*See, e.g.*, D.I. 142 at 21:6-10).

10

could potentially come with **using a conventional fax machine to perform multifunction scan, prints, and fax operations**.

*Id.* at 17:10-14 (emphasis added).

In short, ODA agrees.  Every embodiment, every figure, the applicant's statements during prosecution, and the thrust of the alleged invention are all premised upon a system in which a computer communicates with a conventional facsimile machine[7] by sending and receiving fax transmissions.[8]

### A.   The Specification Shows that the Patent Is Directed to a Standard or Conventional Facsimile Machine

The specification of the patents-in-suit defines the facsimile machine as a "conventional facsimile machine" or "standard facsimile machine."  Each embodiment in the specification corresponds to one of figures 2a-2j, and those figures show that—as Infinity argued—the facsimile machine involved is a standard or conventional facsimile machine.  (*See* '811 patent, figs. 2a-2j; *id.* at 5:66-6:3 (figure 2a shows a "standard facsimile machine"); *id.* at 6:14-21 (same, as to figures 2b and 2c)).  The specification further states that "the interface circuitry of the present invention . . . enables a PC to utilize a ***conventional facsimile*** as a sophisticated scanner or printer."  (*Id.* at 2:30-32; *see also id.* at Abstract ("Apparatus for interfacing a ***conventional facsimile machine*** with a PC . . ." (emphasis added)).  Moreover, that is the very purpose of the invention: it is a less expensive way to simulate the functions of a telephone network so that a standard facsimile machine can send faxes to and from a local computer.

---

[7]   The applicant used the phrases "standard facsimile machine" and "conventional facsimile machine" interchangeably.  *Compare, e.g.*, '811 patent fig. 2a *with id.* at Abstract.

[8]   This says nothing of whether "generic" or "unmodified standard protocol" *software* must be used on the computer.

**B.     Infinity's Construction is Insupportably Broad**

Despite its argument that the claims were limited to a conventional facsimile machine, Infinity now seeks a broad construction of this term that encompasses *any* "device that is capable of sending and receiving a fax, including associated scan and print functionality."  Not only is this construction contrary to the intrinsic evidence, it is untenable because it encompasses devices outside of any reasonable reading of the patents-in-suit.  For example, any computer with a fax modem, a printer and a scanner is a "facsimile machine" under Infinity's definition.

The problems with Infinity's construction are particularly apparent in light of the applicant's efforts during reexamination to ***distinguish*** a device that could send and receive faxes, with the associated fax and print functionality.  Specifically, the claims were rejected in view of U.S. Patent No. 5,598,533 to Yokota ("*Yokota*"), which discloses a facsimile machine with an integrated computer, scanner, and printer:



(Ex. 40 at Abstract, fig. 2A).  The applicant distinguished *Yokota* by arguing that it is "neither a standard PC nor a ***standard Facsimile*** but rather the conglomeration of the two . . . ."  (Ex. 6 at 19).  The applicant argued that "Yokota is not a simple interface or method for connecting a standard PC to a ***standard facsimile machine*** via a bidirectional direction connection via passive link but is rather a method of integrating a fax and PC into a single device."  (Ex. 6 at 20 (emphasis added)).  *Yokota*, therefore, "does not teach the simple interface advantage that is ***the core of the Nachman patent***, namely allowing someone to interface between a PC and ***a standard fax*** for

scanning and printing purposes"—*i.e.*, by sending and receiving faxes.  (*Id.* at 31 (emphasis added)).  Hence, the patentee made it very clear that the claimed subject matter was limited to the use of a "conventional" or "standard" facsimile machine as opposed to a combined device.

C.     **The Patentee Tied His Claims to Standard or Conventional Facsimile Machines During Re-examination**

The patentee repeatedly tied his claims to standard or conventional facsimile machines during reexamination to show that his claims were supported by the original '278 application. (*See, e.g.*, Ex. 3 at 9 ("[T]he methods of the instant patent enable a ***conventional facsimile machine*** to communicate with a personal computer, and vice versa . . . ." (emphasis added)); Ex. 4 at 1 ("the claims recite a method enabling a ***conventional facsimile machine*** to communicate with a personal computer" (emphasis added)); Ex. 8 at 1 ("The 811 patent teaches claims that recite a method enabling a ***conventional facsimile machine*** to communicate with a personal computer" (emphasis added)); Ex. 11 at 4 (same); Ex. 14 at 5 (same)[9]).  The applicant went so far as to submit a slide entitled "Conventional & Standard" that lists 15 instances in which those words are used in the specification to show that the examiner's interpretation of "generic" as including "proprietary software" was wrong, because such software "could not work . . . with a conventional or standard facsimile machine."  (Ex. 10 at Infinity0009183, Infinity0009185).

D.     **The Applicant Cannot Expand the Meaning of Facsimile Machine**

Consistent usage of a claim term in the patent specification provides guidance as to how to construe the term.  *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (limiting the

---

[9]     The applicant submitted a declaration that also confirmed the intended goal of the invention was the "ability to use a fax machine as a printer or scanner."  (Exh. 14 at 9).  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the invention as a whole, this description limits the scope of the invention.").

construction of the claim term "board" to refer to wood cut from a log because of the term's consistent usage in the specification). Here, the patent specification repeatedly uses the term "facsimile machine" as a conventional or standard facsimile machine, as distinguished from a "printer" or a "scanner." The specification repeatedly differentiates between these devices. *See* '811 Patent at 2:30-32. ("FIG. 1 is a circuit diagram of the interface circuitry of the present invention which enables a PC to utilize a conventional facsimile as a sophisticated scanner or printer."); *id.* at 4:27-28 ("Assuming that the local facsimile is desired to be operated in combination with the PC and to function as a scanner . . . ."); *id.* at 5:32-34 ("Operation of the facsimile machine in combination with the PC wherein the facsimile machine operates as a printer is as follows . . . ."); *id.* at 8:59–63 ("The facsimile machine, although operating in its normal fashion, functions very effectively as a scanner or printer . . . and provides a scanning or printing capability at a mere fraction of the cost of conventional scanners or printers."). These references explaining how the claimed invention enables a conventional facsimile machine to operate as a printer or scanner require that the facsimile machine not have these capabilities in the first place. *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009) (construing a claim term to require a specific limitation because the specification repeatedly and uniformly describes it that way); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (applicant defines a claim term "by implication" by using it throughout the specification in a way consistent with a single meaning).

Thus, a person of ordinary skill in the art, when reading the term "facsimile machine" in the context of the intrinsic evidence, would understand the term to refer to a standard facsimile machine or a conventional facsimile machine.

## V.   **"Passive Link" Is Indefinite**

During prosecution, the applicant took irreconcilably conflicting positions on two issues:

(1) whether a "passive link" can include an "intervening apparatus," and (2) whether the "passive

link" must extend to a port on the *housing* of the computer or all the way to the *I/O bus* of the

computer.  Because of those conflicting positions, the claims using that term, when "read in light

of the specification . . . and the prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

U.S. 898, 901 (2014); *see also Teva*, 789 F.3d at 1345 (Fed. Cir. 2015) (reversing district court

finding of no indefiniteness, because the applicant's contradictory positions during prosecution of

related patents precluded a finding of reasonable certainty as a matter of law).

### A.   **The Applicant Took Conflicting Positions Regarding "No Intervening Apparatus"**

The applicant took conflicting positions as to whether a "passive link" can include an

intervening apparatus:

| Explicit definition and distinguishing prior art | Arguing for earlier priority date |
|---|---|
| ". . . a 'passive link' is one where . . . data is transferred[] with **no** intervening apparatus . . . ."<br><br>(Ex. 2 at 18 (emphasis added); *see* Ex. 25 at 7). | A passive link **can** involve an intervening apparatus, such as a modem.<br><br>(Ex. 38 at 6-8, *see, e.g.*, Ex. 54 at 1-9, 24-25). |

As set forth above, the applicant distinguished *Perkins* during prosecution on the grounds

that it included an intervening apparatus consisting of a modem, processor, and various other

circuitry.  (Ex. 25 at 7-12).  The applicant contrasted *Perkins* with figures 2f-2g of the '811 patent

specification and the accompanying text, which depict and describe a direct digital connection

between the facsimile machine and the computer with no components between them.  (*Id.* at 9).

The applicant specifically noted that *Perkins'* method "result[s] in demodulation or modulation"

15

along the link, whereas "the Applicant transfers digital data from the facsimile transceiver through a passive link." (*Id.* at 12; *see id.* at 10 (noting that demodulation of the modulated signal is the function of the modem)). Later, the applicant explicitly defined "passive link" as, in relevant part, "one where . . . data is transferred[] with **no** intervening apparatus . . . ." (Ex. 2 at 18). In that filing, the applicant again pointed to the text describing figure 2g, where the modem in the facsimile machine processes signals and sends them out of a port on the facsimile machine, then over a cable path to the computer without any intervening modem or other circuitry on the computer's side. (*Id.* at 21; *see also* '811 patent, fig. 2g). The applicant distinguished prior art where an "expansion board 18 is integrated in the RS 232 cable path between the Fax. 1 and the PC of Fig. 1," because "the Applicant does not require *any* intervening apparatus between the PC and the facsimile machine." (Ex. 2 at 22-23 (emphasis added)).

During re-examination, however, the patentee changed his position to support a claim of priority to the '278 application. There, the patentee took the position that figure 2e discloses a "passive link" despite the presence of a modem—a position that was ultimately rejected by the PTO. ('811 patent, fig. 2e; Ex. 38 at 6-8 (noting applicant's argument regarding figure 2e); *see also* Ex. 54 at 1-9, 24-25 (patentee's appeal brief repeatedly citing figures 2a-2e as disclosing a "passive link," and arguing that figure 2e discloses a "digital" passive link)). If the presence of a modem destroys the "passive link" (as the patentee has asserted), then he cannot claim priority on the basis of figure 2e. Alternatively, if the presence of a modem does *not* destroy the "passive link" (as he has asserted), then the claims cannot be distinguished from *Perkins* on that basis.

Thus, the term "passive link" is indefinite because a person of skill in the art cannot determine with reasonable certainty whether a modem or other circuitry on the path of the

connection destroys the passive link—as the PTO held—or not.  Because this term appears in every asserted independent claim,[10] all of the asserted claims are invalid as indefinite.

### B.     The Applicant Took Conflicting Positions Regarding the Endpoints of the Passive Link

The applicant also took opposite positions regarding the *endpoints* of the "passive link":

| Distinguishing *Perkins* | Arguing for earlier priority date |
|---|---|
| An intervening apparatus installed in the computer between "the I/O bus of the computer" and the outside of "the box containing the computer" is "peripheral" to the computer, ***is not a part of the computer***, and is instead ***part of the passive link***.<br><br>(Ex. 23 at 15). | An intervening apparatus installed in the computer between "the I/O bus of the computer" and the outside of "the box containing the computer" ***is a part of the computer***, and is ***not a part of the passive link***.<br><br>(Ex. 23 at 15; *see, e.g.*, Ex. 14 at 7). |

First, the applicant distinguished *Perkins* because "Perkins has modified the computer with his invention," (Ex. 23 at 11), and argued that the "passive link" term requires no "intervening apparatus" at all between the "the I/O bus of the computer" and the facsimile machine, (Ex. 25 at 7, 12).  That "intervening apparatus" included the modem, processor, and all other circuitry of *Perkins'* device 3, which "should be regarded as a *peripheral device* to the computer which processes data ***before it is transmitted to the I/O bus of the computer***" even though it was installed "within the box containing the computer."  (*Id.* (emphasis added)).

At the time, the applicant applied the same standard to his invention and treated applicant's interface circuit 10 and modem as "peripheral" devices even if installed in the computer.  The applicant specifically pointed to the embodiments shown in figures 2f-2h because they "show[] that a modem is not required at the computer."  (Ex. 25 at 9).  Those figures show that ***nothing*** is

---

[10]   The asserted claims include the following: '423 patent, claims 1, 2, 3, 4, 6; '574 patent, claims 1, 2, 4, 5, 7, 8; '915 patent, claims 1, 6, 7, 8, 9, 14, 15; '811 patent, claims 1, 2, 4, 6, 7, 18, 19, 20.

on the line between the facsimile machine and the computer—no modem, circuits, or processors, whether internal or external to the computer.  ('811 patent, figs. 2f-2h).  The applicant at the time had two claims that *did* require an "internal or external modem" at the computer, claims 28 and 37, but amended those such that the "passive link" in those claims was between the conventional facsimile machine and the "modem," not the computer, and distinguished those claims from *Perkins* on other grounds.  (Ex. 25 at 11, 13, 17-19).  Thus, the applicant recognized that the modems in those claims would otherwise destroy the passive link between the facsimile machine and the "computer."  The applicant went on to explicitly define "passive link" as a link where "data is transferred[] with no intervening apparatus."  (Ex. 2 at 18; D.I. 148 at 5; *see also* Ex. 38 at 6-8 (PTO confirming that a modem cannot be a part of a passive link)).

At this point, a person of ordinary skill in the art would have understood that *no* intervening apparatus, including a modem or any other circuitry, may exist along the passive link of his invention, whether internal to the computer or not.

However, the patentee then reversed his position.  To prove priority during re-examination, the applicant **redefined** "passive link" and "computer" so that the passive link exists only "on the cable between the PC's RJ-11 [port] and the fax's RJ-11 [port]"—*i.e.*, the link stops at the modem's RJ-11 port on the housing of the computer and does not include the modem itself.  (Ex. 14 at 7; *see also* Ex. 33 at 7-8).  He took this position so that he could rely on figures 2b-2d of the original '278 application, each of which shows a *fax modem* installed inside the computer between the I/O bus of the computer and the outside of the box containing the computer.  ('811 figures 2b-2d (showing, *e.g.*, circuits "[o]n an Internal PC Card"; Ex. 53 at 116:9-17 (deposition testimony of patentee's prosecution expert Dr. Marc E. Levitt confirming that the modem shown in fig. 2a—identical in this respect to fig. 2c—is installed between the computer's bus and the facsimile

machine); *see also* '811 patent, 6:31-37 (describing the bus)).  The patentee's prosecution expert specifically addressed the existence of the modems inside the computer of those figures, and argued that they do not impact the "passive link" because they are installed "*within the computer*" and therefore not "along the path" of the passive link.  (Ex. 14 at 7).

A person of skill in the art is unable to determine with reasonable certainty whether the "passive link" of the claims encompasses a modem or other circuitry installed on the computer's bus, or does not.  If it does, then the applicant could not have distinguished *Perkins* based on its use of an "intervening apparatus" installed in the computer.  If it does not, then the applicant cannot have claimed priority to the embodiments shown in figures 2b-2d, because the modems and other circuitry of those embodiments are an "intervening apparatus" installed in the computer.  *See Teva*, 789 F.3d at 1345 (reversing lower court and holding claims indefinite where the applicant took contrary positions as to the meaning of claim term); *In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) (holding a term indefinite where "the term's ill-defined boundaries coupled with the applicant's erratic use of the term fails to inform skilled artisans about the scope of the invention with reasonable certainty"); *Transcend Med., Inc. v. Glaukos Corp.*, Civ. A. No. 13-830, 2015 U.S. Dist. LEXIS 124863, at *22 (D. Del. Sep. 18, 2015) (finding term indefinite where the applicant "variously represented [different meanings of the term] to the USPTO," and rejecting applicant's "experts['] attempt to salvage the inconsistency by adopting the term's plain and ordinary meaning" as "impermissibly rewrit[ing] the specification and ignor[ing] the relevant prosecution history.").[11]

---

[11]  Claim 6 of the '811 patent is additionally indefinite because the applicant's definition of "passive link" itself, and the preamble to claim 6, require that the link extend between the "computer" and the facsimile machine, but the body of claim 6 requires that it extend from the facsimile to the computer's "modem."  (*See* '811 patent, claim 6).

The term "passive link" is therefore indefinite.  Because this term appears in every asserted independent claim of the patents-in-suit, those claims are invalid as indefinite.

## VI.    **"Computer" Is Indefinite**

"Computer" is indefinite for one of the same reasons as "passive link," set forth above: a person of skill in the art cannot determine whether circuitry, such as a modem or processor, that is installed inside a computer is part of the "passive link" or part of the "computer."  Because "computer" is included in all asserted claims, the claims are therefore invalid as indefinite.

## **CONCLUSION**

For the foregoing reasons, ODA respectfully requests that the Court construe the "facsimile machine" terms to mean "standard facsimile machine" or "conventional facsimile machine," and hold the asserted claims invalid because the terms "passive link" and "computer" are indefinite.

Respectfully submitted,

SHAW KELLER LLP

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Jeff Castellano (No. 4837)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com
*Attorneys for Oki Data Americas, Inc.*

OF COUNSEL:
Marc R. Labgold, Ph.D.
Patrick J. Hoeffner
NAGASHIMA HASHIMOTO & YASUKUNI
12005 Sunrise Valley Drive, Suite 203
Reston, VA 20191
(703) 901-8860

Dated: December 21, 2018