IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INFINITY COMPUTER PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-463-LPS-CJB |
| | ) | |
| OKI DATA AMERICAS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT OKI DATA AMERICAS, INC'S
## <u>ANSWERING CLAIM CONSTRUCTION BRIEF</u>

John W. Shaw (No. 3362)
Jeff Castellano (No. 4837)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com
*Attorneys for Oki Data Americas, Inc.*

OF COUNSEL:
Marc R. Labgold, Ph.D.
Patrick J. Hoeffner
NAGASHIMA HASHIMOTO & YASUKUNI
12005 Sunrise Valley Drive, Suite 203
Reston, VA 20191
(703) 901-8860

Dated: January 22, 2019

## **TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.    Facsimile Machine ................................................................................................ 2

        A.    ODA Is Not Importing a Limitation into the Claims ...................................... 2

        B.    The Specification Equates "Conventional Facsimile Machine" and "Standard Fax Machine" with the Term "Facsimile Machine" ..................... 7

        C.    Infinity and Its Expert Have Confirmed the Parent '558 Patent Is Admittedly Drawn to a "Conventional Fax Machine" .................................. 8

        D.    Infinity's Own Expert Could Not Support Its Proposed Construction ......... 10

        E.    Infinity's Hearsay Fact Testimony Supports ODA ...................................... 11

    II.    Passive Link ........................................................................................................ 12

        A.    Infinity Offers No Explanation the "Plain Meaning" of "Passive Link" and Its Definition Is Inconsistent with the Applicant's and the PTAB's ...... 12

        B.    Dr. Levitt Cannot Explain the Patentee's Inconsistent Positions ................ 14

            1.    Dr. Levitt Admits that Interface Circuit 10 Is an "Intervening Apparatus" ........................................................................................ 14

            2.    The Patentee Indisputably Took the Position that Figures 2a and 2e Disclose a "Passive Link" ................................................................. 15

            3.    The Patentee's Positions Are Irreconcilable ...................................... 16

            4.    Dr. Levitt Also Fails to Resolve the Patentee's Conflicting Statements Regarding the Endpoints of the "Passive Link" .................................. 17

        C.    Infinity Has Not Shown that the PTO Addressed Indefiniteness and, Regardless, the Court Is Not Bound by the PTO's Conclusions ................. 18

    III.    Computer ............................................................................................................. 19

CONCLUSION .................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Aia Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011) ..................................... 11

*Ancora Technologies, Inc. v. Apple, Inc.*, 744 F.3d 732 (Fed. Cir. 2014) ................................... 19

*Apple Computer, Inc. v. Articulate Systems, Inc*., 234 F.3d 14 (Fed. Cir. 2000)........................... 3

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp*., 533 F.3d 1362 (Fed. Cir. 2008).... 11

*Biovail Corp. v. Andrx Pharms., Inc*., 239 F.3d 1297 (Fed. Cir. 2001)........................................ 9

*CyWee Grp. LTD v. Motorola Mobility LLC*, Civil Action No. 17-780-RGA, 2018 U.S. Dist. LEXIS 215380 (D. Del. Dec. 21, 2018) ................................................................................. 11

*In re Katz Interactive Call Processing Patent Litig*., 639 F.3d 1303 (Fed. Cir. 2011)................. 9

*Kim Laube & Co. v. Wahl Clipper Corp.*, 2012 U.S. Dist. LEXIS 193827 (C.D. Cal. Oct. 30, 2012) ........................................................................................................................................ 19

*Kraft Foods, Inc v. Int'l Trading Co*., 203 F.3d 1362 (Fed. Cir. 2000) ........................................ 6

*Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*, No. 11-409-LPS-CJB, 2012 U.S. Dist. LEXIS 81156 (D. Del. June 12, 2012) ................................................................................................. 7

*Merrill v. Yeomans*, 94 U.S. 568 (1876) ....................................................................................... 7

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) .................................................. 13

*NTP, Inc. v. Research in Motion, Ltd*., 418 F.3d 1282 (Fed. Cir. 2005) ....................................... 9

*Omega Eng'g, Inc., v. Raytek Corp*., 334 F.3d 1314 (Fed. Cir. 2003) ......................................... 9

*Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 3, 7

*Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No. 11-902-LPS-CJB, 2014 U.S. Dist. LEXIS 67861 (D. Del. May 15, 2014)................................................................................................. 11

*Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350 (Fed. Cir. 1999) ............................ 6

*Regents of the Univ. of Minn. v. AGA Med. Corp*., 717 F.3d 929 (Fed.Cir.2013)........................ 5

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ........................ 3

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc*., 242 F.3d 1337 (Fed. Cir. 2001) .... 5

*SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351 (Fed. Cir. 2006) .............................................. 19

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) ....................... 5

*Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999) .................................. 6

*Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326 (Fed. Cir. 2005).......... 6

**Rules and Regulations**

37 C.F.R. § 1.84 ...................................................................................................................... 6

## NATURE AND STAGE OF THE PROCEEDINGS

Infinity makes few actual arguments in support of its proposed constructions, and instead relies largely on a recycled expert declaration from another case and on out-of-context, hearsay deposition transcripts of non-expert witnesses, also from another case.  ODA objects to the declaration and transcripts as inadmissible under the rules of evidence, and to the extent they have any relevance, it is because they undercut Infinity's positions in this case.  The declaration is drafted to be responsive to that of another expert primarily on issues not before this Court.  To the extent it is relevant, it argues ***against*** a construction of "passive link" like Infinity's, and states that the inventor's own definition "creates . . . uncertainty within the claim."  (*See* D.I. 149 at 17; *id.*, Ex. 6 at ¶ 62).  The third-party deposition transcripts fare no better: the first is irrelevant, and the second undermines Infinity's position.  ODA respectfully requests that the Court construe "facsimile machine" as a "standard facsimile machine" or "conventional facsimile machine" as set forth in the specification, and hold that the terms "passive link" and "computer" are indefinite.

## STATEMENT OF FACTS

Infinity's background section consists primarily of inaccurate factual contentions and attorney argument.  To the extent that it does not, it is irrelevant to the construction of the terms at issue in this briefing.  ODA will address only the following inaccurate point, and will assume the remainder of the material is correct for the purposes of claim construction only, rather than clouding the record with unnecessary disputes.

Infinity claims that the invention of the patents-in-suit was recognizing that "generic communication protocols" could be used to communicate with a fax machine using a computer— in other words, that a computer could print or scan by sending or receiving faxes to a local facsimile machine using hardware to simulate a telephone network.  (D.I. 149 at 5).  But Bruce Nachman did not invent that idea.  In fact, he admitted in the specification that this concept was known in

the prior art, and he cited other methods for performing that concept in prosecuting his patent. (’811 patent, 1:31-35; Ex. 1 at 1-2 (information disclosure statement); Ex. 42 (Lin)).   What Nachman actually identified as his invention was a *simpler, lower-cost interfacing circuit* for simulating a phone network to enable a standard PC to use a conventional facsimile machine as a printer and/or scanner, but which did not require a microprocessor to do so.   (Ex. 49 at 22 (criticizing prior art method of simulating a phone network as too "complicated"); Ex. 48 ("’278 app.") at 2:1-7; *id.* at 2:9-4:4)).   He then also recognized that his new, simple circuit could be placed between the facsimile machine and the computer, or inside of either.   (’278 app., figs. 2a-2e).   Nachman or his representatives later filed a continuation-in-part application which added new embodiments, (*see* ’811 patent, figs. 2f-2h), but they have continued to argue that the original ’278 application contained a sufficient written description of the later claims to support their claim of priority to it.   (*See, e.g.*, Ex. 54 at 12 ("The Appellant submits that the earlier filed ’278 Application (now the ’558 patent) supports each and every limitation of the claims of the ’811 Patent.")).   In light of the inventor's own statements, Infinity cannot claim that he invented the idea of using "generic communication protocols"—i.e., fax protocols—to print or scan.

## ARGUMENT

I. **Facsimile Machine**

A. **ODA Is Not Importing a Limitation into the Claims**

Infinity complains that ODA improperly seeks to read limitations into the claims by construing the claim term "facsimile machine" as meaning a "standard facsimile machine" or a

"conventional facsimile machine,"[1] which Infinity asserts is limiting the claim term to a preferred embodiment.  (D.1. 149 at 16).  Infinity is wrong on both counts.

Infinity's definition is "divorced from the intrinsic evidence."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005).  Infinity's definition of "facsimile machine" is an overbroad and generic description of ***any device*** that is capable of sending and receiving a facsimile, whereas the specification makes clear that the patents-in-suit are directed to an "[a]pparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer."  ('811 patent at Abstract).

The Federal Circuit has made clear that claims in a patent should be construed in light of what the patentee actually invented, including what the patentee stated was the invention's purpose and the problems it was intended to resolve:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors ***actually invented*** and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1329 (emphasis added) (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)); *see also Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) ("the claim must be interpreted in light of the teachings of the written description and purpose of the invention described therein.").

---

[1]   ODA's alternative constructions are equivalent and interchangeable ways of describing the same thing.  Infinity's expert Dr. Levitt confirmed that one of ordinary skill in the art in April 1994 would have understand these terms mean the same thing.  (Ex. 55 at 33:15-20).

Here, the inventor clearly identified the problems existing in the prior art that his invention was intended to solve:

> As is well known in the art, ***a conventional facsimile*** scans documents and transmits the scanned information through a modem in a standard facsimile format to a remote facsimile which receives the transmitted data by a modem and converts the transmitted data into a form for printing a document which is a replica of the document scanned by the transmitting facsimile.
>
> Scanning and printing devices especially adapted for use with PCs (i.e. personal computers) are relatively expensive devices typically costing many hundreds of dollars to as much as several thousands of dollars for applications requiring character recognition capabilities.
>
> It has been recognized that ***conventional facsimile machines*** may be utilized as scanners or printers for PCs. However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity.

('811 patent at 1:17-36; emphasis added). With this background, the inventor stated that the object of the invention was to provide:

> a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.

('811 patent at 1:40-45). It is highly material that this is not ***one of*** several objects identified under the heading "OBJECT OF THE INVENTION"—it is the ***only purpose*** identified. Infinity's own expert Dr. Levitt confirmed "[t]hat is the object of the invention." (Ex. 55 at 35:8-36:4). It is clear from this context that the term "facsimile" refers to a "conventional facsimile machine," which, absent the interface circuit of the present invention, would be unable to function as a printer or a scanner for a standard PC.

4

That the term "facsimile machine" means a "conventional" or "standard facsimile machine" is further borne out by the drawings and the remainder of the specification. Starting with drawings, the description of Figure 1 unambiguously reads:

> FIG. 1 is a circuit diagram of *the interface circuitry of the present invention* which *enables a PC to utilize a conventional facsimile* as a sophisticated scanner or printer.

('811 patent at 2:30-32; emphasis added).[2]  Similarly, the description of Figures 2a-2i reads:

> FIGS. 2a-2i show simplified block diagrams of *various system arrangements employing the circuitry of the present invention*.

('811 patent at 2:36-38; emphasis added).

Consistent with the drawing, the specification only discloses a "standard" or "conventional" facsimile machine. Figure 1 is described in detail in the specification, explaining how "interface circuit **10**" functions to enable the facsimile machine to function as a printer and scanner for a locally connected PC. ('811 patent at 2:44-5:63).

Tellingly, each of Figures 2a-2i, and the text of the specification describing them, are based upon the coupling of "standard fax machine **30**" to a PC via, *inter alia*, "interface circuit **10**." ('811 patent at figs. 2a-2h and 5:66-8:26). Every embodiment disclosed in the patents-in-suit—including those added by the continuation-in-part application—includes "standard fax machine **30**" and "interface circuit **10**." (*See* D.I. 136-1 at ¶ 5). Never once is there so much as a passing comment in the specification that the facsimile machine can be anything other than a conventional facsimile machine. This is logical since if the printer or scanner could interface directly with such a device,

---

[2]  "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).

there would be no need for the alleged invention.  Thus, a standard/conventional facsimile machine is not a preferred embodiment, it is the only embodiment.[3]

In the present case, where the background of the invention, the object of the invention, every figure, and every disclosed embodiment are directed to a "standard" or "conventional facsimile machine," construing the claim to be commensurate in scope with the disclosure is not improperly limiting the claims to a particular embodiment.  *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc*., 418 F.3d 1326, 1340 (Fed. Cir. 2005) (construing claim term to require oxidative discoloration in part because the only type of discoloration referred to in the patent was oxidative discoloration); *Kraft Foods, Inc v. Int'l Trading Co*., 203 F.3d 1362, 1367-69 (Fed. Cir. 2000) (limiting "back panel" to the "rigid" back panel described in every embodiment in the specification and excluding the "flexible back panel of the accused device"); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382-84 (Fed. Cir. 1999) (limiting "frame" to "character-based" data frames and excluding the "bit-mapped" data frames of the accused device, where specification described only "character-based" frames and the prosecution history distinguished the claims from prior art "bit-mapped" frames).

Accordingly, ODA is not attempting to import a limitation into the claims, but instead seeks to have the claims construed in light of the teachings of the intrinsic evidence as a whole.  "The patent system is based on the proposition that claims cover only the invented subject matter."

---

[3]    During his deposition, Dr. Levitt attempted to argue that there are embodiments that are not limited to "standard fax machine **30**" and "interface circuitry **10**."  To do so, he asserted that the "interface circuitry **10**" in Fig. 2A is not the same "interface circuitry **10**" in Fig. 2h.  (Ex. 55 at 41:8-42:24).  However, this argument is untenable because it directly contradicts the requirements of 37 C.F.R. § 1.84(p)(4), which reads: "The same part of an invention appearing in more than one view of the drawing must always be designated by the same reference character, and ***the same reference character must never be used to designate different parts***." (Emphasis added).  *See also*, *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1356–57 (Fed. Cir. 1999) (holding identical language in separate clauses indicates the clauses have the same meaning).

*Phillips*, 415 F.3d at 1321.  "As the Supreme Court has stated, 'it seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.'"  *Id.* (quoting *Merrill v. Yeomans,* 94 U.S. 568, 573-74 (1876)).

### B.   The Specification Equates "Conventional Facsimile Machine" and "Standard Fax Machine" with the Term "Facsimile Machine"

It is undisputed that the functionality of "interface circuit **10**" is that it enables the conventional facsimile machine to interface with a PC to operate as a scanner or a printer by simulating the functions of a telephone network.  (Ex. 55 at 45:16-46:5; '811 patent, 2:30-33, 4:25-6:5).  Obviously, if the "device"—the fax machine—were already capable of being used as a printer and a scanner, there would be no need for any such interface circuitry.  The specification makes clear that the entire purpose of the invention is to enable a PC to utilize a "conventional facsimile machine" as a scanner and printer.  If the device could already do so, like a printer or a scanner, there would be no purpose or advantage.  *See Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*, No. 11-409-LPS-CJB, 2012 U.S. Dist. LEXIS 81156, at *31 (D. Del. June 12, 2012) (rejecting proposed construction in part because it "would not offer the advantages that are described in the '383 patent as being part of the 'present invention.'").

It is important to note that, despite the fact that Figure 1 is expressly described as "a circuit diagram of the interface circuitry of the present invention which enables a PC to utilize a conventional facsimile," ('811 patent, 2:30-33), in the description of Figure 1 the "conventional facsimile machine" is interchangeably referred to as "local facsimile machine" (*id.* at 2:61-62; 2:65; 3:2; 3:9; 5:8; *see also id.* at 3:24; 4:28; 4:36) and, importantly, as simply "facsimile machine" (*id.* at 5:4; 5:11-12; 5:15; 5:17-20; 5:32-34; 5:36; 5:42-43; 5:48-63).  Similarly "standard fax machine 30"—which is indisputably a "standard facsimile machine"—is repeatedly referred to as

7

"facsimile machine", "facsimile machine 30" or "fax machine" (*id.* at 6:14-15; 6:41; 6:52; 6:64; 7:17; 7:20; 7:35; 7:42; 7:46; 7:55; 7:61; 7:65-66; 8:5; 8:20-21; 8:23; 8:33; 8:37-39). This is then all summed up as follows:

> The circuitry of the present invention provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another over a telephone line. The facsimile machine, although operating in its normal fashion, functions very effectively as a scanner or printer as and when needed and provides a scanning or printing capability at a mere fraction of the cost of conventional scanners or printers.

(*Id*. at 8:56-63).  There is no question that the "facsimile machine" in this context is a "conventional facsimile machine" that is enabled to be used as a printer or scanner by the "circuitry of the present invention."

### C.    Infinity and Its Expert Have Confirmed the Parent '558 Patent Is Admittedly Drawn to a "Conventional Fax Machine"

The patents-in-suit all share a common specification.  That specification is based upon the specification of the '278 application," filed on April 11, 1994, which issued as U.S. Patent No. 5,530,558 (the "'558 patent") (Ex. 56).  Infinity's expert, Dr. Levitt, has testified that "[t]he '558 patent *teaches a method of enabling a conventional facsimile machine* to communicate with a personal computer, and vice versa, over a communications link using generic send/receive driver communications software." (D.I. 149, Ex. 6 at ¶ 28 (emphasis added)).   Dr. Levitt's characterization is consistent with that of Infinity, which stated the '558 patent is "directed to a particular embodiment of the invention that was manufactured and sold by Infinity."  (D.I. 149 at 7).  Indeed, the '558 patent is likewise directed to a method of using interface circuit **10** and a conventional facsimile machine, ('558 patent, Abstract), as shown in the embodiment described in the '558 patent specification at 2:44-5:63.  As noted above in reference to the same passages of the common text of the '811 patent specification, the embodied "facsimile machine" in that passage is a "conventional facsimile machine."  Dr. Levitt's declaration shows pictures of the

8

corresponding "particular embodiment of the invention that was manufactured and sold by Infinity." (Levitt Decl., ¶ 132). As is readily apparent from those pictures, a "conventional facsimile machine" is depicted thereon (shown immediately below).



That the '558 patent claims are admittedly drawn to a conventional facsimile machine is dispositive. Claim 1 of the '558 patent is drawn to "[a] device for coupling a facsimile machine with a personal computer, comprising: . . ." The Federal Circuit has held that claim terms are ordinarily interpreted consistently across patents arising from a common specification. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."); *Biovail Corp. v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) (claim language "must be read consistently with the totality of the patent's applicable prosecution history," including parent applications). This doctrine applies not only to identical related applications, but also to continuation-in-part applications. *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1333-34 (Fed. Cir. 2003) ("Omega attempts to avoid this doctrine by citing *Advanced Cardiovascular* as shielding continuations-in-part from narrowing disavowals made in parent applications. Our precedent holds to the contrary . . . we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed

meaning."). Thus, the term "facsimile machine" in the patents-in-suit should be construed to have the same meaning it has in the '558 patent: a conventional fax machine.

### D.   Infinity's Own Expert Could Not Support Its Proposed Construction

Infinity's proposed construction of the claim term "facsimile machine" is overbroad and unsupported by the disclosure. For example, during his deposition, Dr. Levitt stated that certain devices that could fax, with the associated scan and print hardware, were nonetheless ***not*** "facsimile machines." ***First***, Dr. Levitt testified that a device is not a "fax machine" if it does not include the "associated scan and print functionality" in the same "box"—*i.e.*, it if does not include everything in a single integrated device like a conventional facsimile machine. (Ex. 55 at 63:4-65:15). He testified that the term cannot even include a system where the machine is formed from individual components "bolted" together. (*Id*. at 67:3-68:8). ***Second***, Dr. Levitt testified that in addition to the requirement that the print and scan functionality be contained in the "box" of the device, the scan functionality is also limited to something that scans an image that can be faxed "directly." (*Id*. at 71:4-16).[4] ***Third***, Dr. Levitt testified that the print functionality is also limited. In addition to requiring it be contained in the "box" of the device, the print functionality is limited to something that can print the scanned or faxed image.[5] (*Id*. at 74:20-25). Thus, the Court cannot adopt Infinity's construction; its own expert has explained why it would need to include at least the foregoing caveats. Indeed, it is not the Court's role to craft a curative construction based on Infinity's flawed analysis. *See Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No. 11-902-LPS-

---

[4]   Dr. Levitt indicated that the proper construction excludes, for example, devices where the "scan" functionality consists of bar code scanners or card scanners. (Ex. 55 at 69:15-71:3; 71:25-72:4; *see also* Ex. 57 (images showing hypotheticals discussed with Dr. Levitt during his deposition)).

[5]   Dr. Levitt indicated that the proper construction excludes, for example, devices where the "print" functionality consists of wireless printers or 3D printers. (Ex. 55 at 63:4-64:21 (all components must be within "a single box"); 73:5-74:25).

CJB, 2014 U.S. Dist. LEXIS 67861, at *47 n.9 (D. Del. May 15, 2014) ("the Court is generally not permitted to re-draft the claims.").  Yet, even then, Dr. Levitt testified that *an ultrasound machine* (as is commonly used by obstetricians to view a fetus in utero) *could be a facsimile machine within Infinity's proposed construction*.  (Ex. 55 at 75:1-25).  This demonstrates not only the impropriety, but the absurdity of Infinity's position: Infinity wants this Court to read out the requirement that the "facsimile machine" actually be a "facsimile machine," and instead re-write the claim to include devices like an ultrasound machine.  *See Aia Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) ("We strive, where possible, to avoid nonsensical results in construing claim language."); *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008) ("We decline to adopt a construction that would effect this nonsensical result."); *CyWee Grp. LTD v. Motorola Mobility LLC*, Civil Action No. 17-780-RGA, 2018 U.S. Dist. LEXIS 215380, at *11 (D. Del. Dec. 21, 2018) (finding that proposed construction was "inappropriate" because it would "read out" a term).

### E.   Infinity's Hearsay Fact Testimony Supports ODA

In support of its "facsimile machine" construction, Infinity also relies on hearsay deposition transcripts of non-expert witnesses from another action.  (D.I. 149 at 14).  To the extent these transcripts may be considered at all, they are either irrelevant or weigh in favor of ODA's construction, not Infinity's.  The first deponent, an Epson witness named Siranush Arabian, states only that "a facsimile . . . in the context of a multi-function device" means "the device actually has the capability to receive and send faxes."  (D.I. 149, Ex. 7 at 35:10-14).  This says nothing of what the term "facsimile machine" means, much less what that term meant to one of skill in the art in 1994.  The second deponent, Elliot Williams, was asked "[w]hat is a facsimile machine," and replied that a "*stand-alone* fax machine is a design that's used to send and receive faxes."  (*Id.*, Ex. 8 at 16:24-25 (emphasis added)).  Infinity's construction is not limited to a "stand-alone fax

11

machine." Moreover, the witness went on to state that all-in-one or multi-function printer[6] ("MFP") devices "have fax capability, but they're not considered faxes." (*Id.* at 17:1-4). Thus, Infinity's non-expert witness testimony actually supports ODA's construction: even if a device such as an MFP can send and receive faxes, and has the associated scan and print functionality, that alone does not make it "a fax machine."

## II.   Passive Link

Infinity asks the Court to adopt a "plain meaning" construction for this term, but does not set forth what that plain meaning is or why the Court should adopt it. It then asks the Court in the alternative to adopt a new, specific construction of "passive link" that is different than the definitions set forth by the applicant and the Patent Trial and Appeal Board ("PTAB"), and which mirrors a definition its own expert criticized for adding "redundancy" to the claim. Meanwhile, Infinity offers no serious rebuttal to ODA's position that this term is indefinite; instead, it relies on its recycled expert declaration that addresses other indefiniteness arguments raised in a different case.

### A.   Infinity Offers No Explanation the "Plain Meaning" of "Passive Link" and Its Definition Is Inconsistent with the Applicant's and the PTAB's

Infinity quickly abandons its unexplained "plain meaning" construction and argues for a construction derived from a definition offered by the applicant during prosecution—a definition that ***Infinity's own expert*** criticizes as "creat[ing] both redundancy and uncertainty within the claim." (*See* D.I. 149 at 17; *id.*, Ex. 6 at ¶ 62). ODA agrees: The definition of "passive link" set forth by the applicant during prosecution—and Infinity's similar construction here—"fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

---

[6]   An "MFP" is a "multi-function printer," a device with scan, fax, and print functionality. (D.I. 149, Ex. 6 at ¶¶ 30-32).

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Yet the applicant's indefinite and redundant definition is at the root of the inconsistent constructions adopted by the PTAB, Infinity's expert, and Infinity:

---

**Patentee's Alt. Definition:** ". . . **said** data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine**, for purposes of providing *both* scanning *or* printing data.**"  (Ex. 2 at 18 (emphasis added)).

**ODA's Alt. Definition, Dr. Levitt's Definition, and the Definition Applied by the PTAB:** ". . . **said** data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine**[.]**" (*See* D.I. 148 at 5; D.I. 149, Ex. 6 at ¶ 57; Ex. 38 at 6 (emphasis altered)).

**Infinity's Alt. Definition:** ". . . **the** data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine**, for purposes of providing scanning *and/or* printing data**" (D.I. 149 at 17 (emphasis added)).

---

Infinity twice states that its construction is a "verbatim" copy of the construction applied by the PTAB.  (D.I. 149 at 17-19).  That is false.  Infinity's construction adds the text highlighted in green above, "for the purposes of printing and/or scanning," to the end of the construction.  (*Id.* at 17).  As Infinity's expert recognizes, this language is redundant, because the claims already specify whether printing, scanning, or both are required.  (*See, e.g.*, '811 patent, claim 1; D.I. 149, Ex. 6 at ¶ 62).

Moreover, Infinity's arguments for *why* the Court should adopt its alternative construction over ODA's alternative construction are nonsensical.  They argue that "it is not required that the 'passive link' provide both scanning and printing data," apparently rebutting a position that ODA never took.  (D.I. 149 at 19).  But Infinity makes no effort to explain why the term should include their new language, "for purposes of providing scanning and/or printing data," and there is none.  (D.I. 149 at 17).  The patentee's construction as set forth during prosecution is indefinite, both

13

because it is incomprehensible to a person of skill in the art and because of the conflicting positions that the patentee took during prosecution (discussed below).

Thus, to the extent that the Court seeks to construe the term rather than finding it indefinite, ODA respectfully requests that the Court adopt ODA's alternative construction.

### B. Dr. Levitt Cannot Explain the Patentee's Inconsistent Positions

Infinity makes no effort in its brief to reconcile the inconsistent positions it took during prosecution and re-examination. (D.I. 149 at 17-19). Instead, it offers Dr. Levitt's declaration—drafted to be responsive to another expert's testimony in another case from another district—to show that "there are no inconsistent and irreconcilable definitions of 'passive link' . . . ." (*Id.*, Ex. 6 at ¶ 71). But the declaration fails to do so.

### 1. Dr. Levitt Admits that Interface Circuit 10 Is an "Intervening Apparatus"

In both his declaration and his deposition in this action, Dr. Levitt admits that interface circuit 10 as shown in the figures of the patents-in-suit is an "intervening device." In his declaration, Dr. Levitt states that "figure [2e] was not mentioned as supporting the passive link disclosure [because a] device (Fax Modem + Interface Ckt) sits between the PC's connection port and the FAX's connection port." (*Id.*, Ex. 6 at ¶ 70). In other words, figure 2e does not disclose

a passive link because interface circuit 10[7] and the modem, which sit in between the fax machine
and the computer, constitute an intervening device:



('811 patent, fig. 2e (emphasis added)).  Dr. Levitt confirmed this in his deposition in this action,
stating that figure 2e "is not -- . . . [it] has never been claimed to be a passive link due to the inter-
--  I have to look it up, but basically there's intervening circuitry on the connection from the fax
machine to the computer," and "interfacing circuit 10 has been looked at as an intervening
apparatus."  (Ex. 55 at 21:12-22:3, 60:22-61:4).

### 2.     The Patentee Indisputably Took the Position that Figures 2a and 2e Disclose a "Passive Link"

Dr. Levitt attempts to avoid the conflict by stating that figure 2e was never relied upon as
disclosing a passive link.  (D.I. 149, Ex. 6 at ¶ 70).  But it was: the patentee repeatedly relied on
these figures in arguing for priority to the '278 application.  (*See* Ex. 54 at 5-9, 24-25 (patentee's
appeal brief repeatedly citing figures 2a-2e as disclosing a "passive link"); *see also* Ex. 38 at 6-8
("To the extent that Appellant contends that Figure 2e discloses a bi-directional direct connection
via a passive link, the evidence on this record does not support such a contention.")).  Thus, Dr.
Levitt cannot avoid the conflict on those grounds.

---

[7]    The patent variously identifies item 10 as "interface circuit," "interface circuit 10," "circuitry
10," "interface 10," and "Interfacing CKT 10."  (*See, e.g.*, '811 patent, Title, 2:44-45, 6:41-42,
6:63; figs. 2a-2e). For consistency, ODA will refer to it as "interface circuit 10."

### 3.     The Patentee's Positions Are Irreconcilable

Dr. Levitt admits that interface circuit 10 is an intervening apparatus, and that a "passive link" is explicitly defined as a link with "no intervening apparatus."  (D.I. 149, Ex. 2 at ¶¶ 57, 70).  He also admits that figures 2a and 2e show a link with an intervening apparatus—interface circuit 10—between the facsimile machine and the computer.  (*Id.* at ¶ 70; Ex. 55 at 21:12-22:3, 60:22-61:4; *see* '811 patent, figs. 2a, 2e).  This is consistent with the patentee's explicit definition of "passive link," and the position it took in distinguishing *Perkins*.  (Ex. 25 at 7, 12; Ex. 2 at 18).  At that time, the applicant's position was consistent: Perkins disclosed an intervening apparatus, but the applicant included embodiments that did not.  (*See* '811 patent, figs. 2f-2h).  But the patentee later relied on figures 2a and 2e as disclosing a "passive link" in its attempt to claim priority to the '558 application, despite the presence of intervening devices including interface circuit 10 and/or a fax modem along the path.  (*See, e.g.*, Ex. 54 at 1-9, 24-25).  This created a conflict:



| *Perkins*' Prior Art (external)<br><br>Applicant: *Perkins*' external configuration ***does not disclose*** a passive link.  (Ex. 25 at 7, 12.) | |
| --- | --- |
| **'278 Application, Figures 2a, 2e**<br><br>Patentee: The ***same configuration does disclose*** a passive link.  (*See, e.g.*, Ex. 54 at 1-9, 24-25). | |

Thus, a person of skill in the art cannot determine with "reasonable certainty" whether an intervening apparatus can or cannot be part of a passive link, and the term "passive link" is indefinite.

16

**4.**  **Dr. Levitt Also Fails to Resolve the Patentee's Conflicting Statements Regarding the Endpoints of the "Passive Link"**

As to the conflict regarding the *endpoints* of the passive link, and the meaning of "computer," Dr. Levitt's attempts to reconcile the applicant's conflicting statements are confusing and, ultimately, serve only to highlight the problem.  Dr. Levitt appears to argue that *Perkins* disclosed an intervening apparatus because it used a "microprocessor."  (D.I. 149, Ex. 6 at ¶¶ 63-70).  But that is irrelevant: both parties agree that *Perkins* disclosed an intervening apparatus.[8]

The applicant distinguished the prior art *Perkins*' device 3 on the basis that it was an intervening apparatus even though it was "***provided on a card for location in the computer***"— just like interface circuit 10 of the '278 application.  (Ex. 39 at 9:29-30 (emphasis added); Ex. 25 at 7-8, 12).  Consistent with that argument, the applicant included embodiments, shown in figures 2f-2h, which do not use interface circuit 10 or a modem internal to the computer, or any intervening apparatus between the computer and the facsimile machine.  (*See* '811 patent, figs. 2f-2h).  The patentee later reversed himself, however, and cited figures 2b-2d as disclosing a passive link, despite the presence of an intervening apparatus—interface circuit 10 and/or a fax modem—inside the computer in those embodiments.  (Ex. 33 at 7-8; Ex. 14 at 7).  He took the new position that

---

[8]    Dr. Levitt also addresses two statements made by the patentee.  He first argues that the patentee's statement that Perkins' device 3 "intercepts the flow of data" relates only to an embodiment where the Perkins device is external to the computer.  But the sentences before and after make clear that the statement relates to the Perkins' device 3 when installed in a computer.  (Ex. 25 at 12 ("even though circuitry of device 3 is placed ***in a card within the box containing the computer*** it should be regarded as a peripheral device to the computer which processes data before it is transmitted to the I/O bus of the computer." (emphasis added)); *id.* ("When Perkins places his device 3 on a card ***internal to the computer*** . . . ." (emphasis added)).  The applicant could not have been more clear that he was distinguishing the ***internal*** embodiment of Perkins because it was an intervening apparatus along the passive link.  Dr. Levitt chooses to disregard the second statement that the "facsimile transmission data never enters the computer I/O Bus until after it is processed by the device 3," because it relates to "processing by device 3." (D.I. 149, Ex. 2 at ¶ 70).  But that, too, is irrelevant.  The parties agree that Perkins' device 3 was an intervening apparatus, and *Perkins* is unambiguous that device 3 was "provided on a card for location in the computer." (Ex. 39 at 9:29-30).

the link need only extend from the port on the facsimile machine to the port on the enclosure of the computer.  (Ex. 14 at ¶¶ 29-30 (excluding the modem from the passive link because it is "within the PC")).  The difference is shown in the following table:



| *Perkins'* **Prior Art (internal)** <br><br> Applicant: *Perkins'* internal configuration ***does not disclose*** a passive link.  (Ex. 25 at 12.) | |
| **'278 Application, Figures 2b-2d** <br><br> Patentee: The ***same configuration does disclose*** a passive link.  (Ex. 33 at 7-8; Ex. 14 at ¶¶ 29-30). | |

A person of skill in the art, looking at the patentee's positions taken during prosecution and re-examination as set forth in the above table, is unable to determine with reasonable certainty what constitutes a "passive link" because the same configuration was asserted to be both a passive link and *not* a passive link.  Either the link extends to hardware provided on a card for location in the computer, and the applicant could not have distinguished *Perkins*, or it does not, and the patentee could not have claimed priority to figures 2b-2d.  Nothing in Dr. Levitt's declaration or deposition testimony resolves the inconsistencies cited in ODA's opening brief.  The "passive link" term is *per se* indefinite to one of skill in the art.

### C.   Infinity Has Not Shown that the PTO Addressed Indefiniteness and, Regardless, the Court Is Not Bound by the PTO's Conclusions

Infinity asserts that because the patents-in-suit have been through reexamination, they cannot be indefinite.  (D.I. 149 at 17-18).  But Infinity does not point to any location in any of the reexaminations where the PTO addressed the definiteness of the "passive link" term.  Moreover, the Court is not obligated to defer to the PTO on claim construction determinations, and should

instead construe the terms *de novo*.  *See SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006) ("[T]his court is not bound by the PTO's claim interpretation because we review claim construction <u>de novo</u>" (emphasis original)); *see also Kim Laube & Co. v. Wahl Clipper Corp.*, 2012 U.S. Dist. LEXIS 193827, at *21 (C.D. Cal. Oct. 30, 2012) (holding that claim construction decision reached by Board on appeal of reexamination was not binding, and reaching difference construction).

## III.    <u>Computer</u>

As described above and in ODA's opening brief, "computer" is indefinite because a person of skill in the art cannot determine the endpoints of the "computer" and "passive link"—i.e., whether the "computer" includes hardware within it, like device 3 of *Perkins* or the interfacing circuit 10 and/or modem of figures 2b-2d of the '278 application.  (*See* D.I. 151 at 15-20).

Infinity argues that such inconsistencies do not result in indefiniteness, citing to *Ancora Technologies, Inc. v. Apple, Inc.*, 744 F.3d 732, 737-38 (Fed. Cir. 2014). But that case is easily distinguished.  *Ancora* dealt with a patent that contained three references in the specification to the idea that a "hard disk" could be "volatile memory."  *Id.*  It determined that "the terms 'volatile memory' and 'non-volatile memory' have a meaning that is clear, settled, and objective in content," and that a "hard disk" *was* volatile memory under the circumstances described in the patent, so the term was not indefinite.  *Id.*

Infinity seems to rely on the *Ancora* dicta that "a clear ordinary meaning is not properly overcome . . . by a few passing references . . . ."  *Id.*  Here, however, the endpoints of the passive link—whether considered as part of the "passive link" term or part of the "computer"—were discussed extensively and relied on heavily to circumvent the *Perkins* prior art reference.  (*See* D.I. 151 at 4-7, 17-18; Ex. 25 at 7, 12)).  The applicant made clear and unambiguous statements distinguishing the *Perkins* device 3 as part of the passive link **even though** it was located inside

the physical confines of the computer's housing, since the "computer" did not include cards installed inside of it.  (*See* Ex. 25 at 7, 12 (the intervening apparatus of *Perkins* "should be regarded as a peripheral device to the computer which processes data before it is transmitted to the I/O bus of the computer" even though it was installed "within the box containing the computer.")).  The patentee likewise made clear and unambiguous statements, during re-examination, redefining "passive link" and "computer" so that the passive link exists only "on the cable between the PC's RJ-11 [port] and the fax's RJ-11 [port]"—*i.e.*, the link stops and the computer starts at the RJ-11 port on the housing of the computer, and does not include interface circuit 10 or the modem itself, both of which are inside the computer.  (Ex. 33 at 7-8; Ex. 14 at ¶¶ 29-30).

These statements are irreconcilable, and nothing in Infinity's brief or its expert's declaration provides a means to resolve the conflict between them.  These terms are *per se* indefinite to one of skill in the art.

## CONCLUSION

For the foregoing reasons, ODA respectfully requests that the Court construe the "facsimile machine" terms to mean "standard facsimile machine" or "conventional facsimile machine," and hold the asserted claims invalid because the terms "passive link" and "computer" are indefinite.

Respectfully submitted,

SHAW KELLER LLP

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Jeff Castellano (No. 4837)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com
*Attorneys for Oki Data Americas, Inc.*

OF COUNSEL:
Marc R. Labgold, Ph.D.
Patrick J. Hoeffner
NAGASHIMA HASHIMOTO & YASUKUNI
12005 Sunrise Valley Drive, Suite 203
Reston, VA 20191
(703) 901-8860

Dated: January 22, 2019

21