IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INFINITY COMPUTER PRODUCTS, INC.,

    Plaintiff,

v.

OKI DATA AMERICAS, INC.,

    Defendant.

C.A. No. 18-463-LPS

William J. Rhodunda, Jr. and Chandra J. Williams, RHODUNDA WILLAMS & KONDRASCHOW, Wilmington, DE

Andrew G. DiNovo, Nicole E. Glauser, Gabriel R. Gervey, and Daniel L. Schmid, DINOVO PRICE LLP, Austin, TX

    Attorneys for Plaintiff


John W. Shaw, Jeff Castellano, and Andrew E. Russell, SHAW KELLER LLP, Wilmington, DE

Marc R. Labgold and Patrick J. Hoeffner, NAGASHIMA HASHIMOTO & YASUKUNI, Reston, VA

    Attorneys for Defendant

**MEMORANDUM OPINION**

June 10, 2019
Wilmington, Delaware

*[signature]*

**STARK, U.S District Judge:**

Plaintiff Infinity Computer Products, Inc. ("Infinity") sued Defendant Oki Data Americas, Inc. ("Oki Data"), alleging that Oki Data infringes Infinity's U.S. Patent Nos. 6,894,811 ("the '811 patent"), 7,489,423 ("the '423 patent"), 8,040,574 ("the '574 patent"), and 8,294,915 ("the '915 patent"). (D.I. 1) The asserted patents relate to systems for connecting a fax machine to a computer so that the fax machine can be used as a printer or scanner. (*See* '811 patent, Abstract) Oki Data makes devices that Infinity contends infringe the patents. (D.I. 1 ¶¶ 17-20)

Presently before the Court are the parties' disputes over the meaning of certain claim terms in the asserted claims. The parties submitted claim construction briefs. (D.I. 149, 151, 159, 162) Infinity submitted a technology tutorial (D.I. 150), to which Oki Data submitted objections (D.I. 161). The Court held a claim construction hearing on February 4, 2019. (*See* D.I. 170 ("Tr."))

**I.    LEGAL STANDARDS**

**A.    Claim Construction**

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven

when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (alteration in original) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in

the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

### B. Indefiniteness

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A claim may be indefinite if the patent does not convey with reasonable certainty how to measure a claimed feature. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). But "[i]f such an understanding of how to measure the claimed [feature] was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the

specification to identify a particular measurement technique." *Ethicon Endo–Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015).

## II. CONSTRUCTION OF DISPUTED TERMS

### A. "facsimile machine" and "fax machine"[1]

| |
|---|
| **Infinity** <br> No construction necessary <br><br> or <br><br> "a device that is capable of sending and receiving a fax, including associated scan and print functionality" |
| **Oki Data** <br> "a standard facsimile machine" <br><br> or <br><br> "a conventional facsimile machine" |
| **Court** <br> "a device that is capable of sending and receiving a fax over a phone line and includes associated scan and print functionality" |

The parties agree that a "fax machine" or "facsimile machine" must be capable of sending and receiving a fax over a phone line. (Tr. 11, 35 (Infinity: "in our view, I think a person of ordinary skill in the art would understand that a fax machine has a phone line sending capability"); *id.* at 17 (Oki Data: "fax machine . . . would normally only communicate with the outside world through a telephone line"))

---

[1] The terms "facsimile machine" or "fax machine" appear in claims 1, 2, 4, 6, 7, and 18-20 of the '811 patent, claims 1-4 and 6 of the '423 patent, claims 1, 2, 4, 5, 7, and 8 of the '574 patent, and claims 1, 6-9, 14, and 15 of the '915 patent.

5

The parties' central dispute regarding this term is whether, as Oki Data contends (D.I. 151 at 10-14), the "fax machine" and "facsimile machine"[2] must be standard or conventional, or whether, as Infinity contends (D.I. 149 at 13-16), the terms may include non-standard and non-conventional machines.

The Court agrees with Infinity because the plain meaning of "fax machine" does not exclude non-standard machines, and the specification further supports this broad construction. Generally, a construction should depart from plain and ordinary meaning only when a patentee acts as its own lexicographer or disavows claim scope during prosecution. *See Poly-Am, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). To narrow the scope of an otherwise broad term, the specification must demonstrate a "clear intention . . . using words or expressions of manifest exclusion or restriction." *Hill-Rom*, 755 F.3d at 1372. Here, the specification does not show any clear intention to require a fax machine to be standard or conventional. To the contrary, Figures 2c, 2f, and 2h show the inventive "interface circuit 10" inside the fax machine. A fax machine including interface circuit 10 would not be standard or conventional. Such a fax machine would also be excluded from the claims under Oki Data's construction, a result that is disfavored. *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("[A]n interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct.") (internal alterations and quotation marks omitted).

The specification suggests that the use of a conventional fax machine may be a preferred embodiment ('811 patent, Abstract), and that a "principal object" of the invention is to allow a conventional fax machine to be used as a scanner or printer using "a circuit of highly simplified

---

[2] The claims use "fax machine" and "facsimile machine" interchangeably. For clarity, the Court will refer to both terms as fax machines.

design and low cost" (*id.*, 1:25-40). Still, nothing in the specification establishes that the fax machine used in the invention *must* be conventional. *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) (holding claims not limited to certain context even though inventor conceived that invention "would be used principally, if not exclusively," in that context, even when specification "refers repeatedly to the advantages of the invention in that context").

Oki Data contends that the patentee's arguments distinguishing U.S. Patent No. 5,598,533 to Yokota ("Yokota") limit the claims to conventional fax machines. (D.I. 151 at 12-13) However, the patentee merely argued that the claimed invention, unlike Yokota, *could be used* with a standard fax machine. (D.I. 148-10 Ex. 6 at 20) (distinguishing Yokota as requiring "a complex memory and interrupt service routine based interface between PC-like and Fax-like components that were integrated into a single box")

### B. "passive link"[3]

**Infinity**
No construction necessary

or

"a link where the initiation of data flow is activated from a setup procedure within the PC and/or the facsimile machine, and the data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine, for purposes of providing scanning and/or printing data"

**Oki Data**
Indefinite

or

---

[3] The term "passive link" appears in claims 1, 6, 7, and 18-20 of the '811 patent, claims 1, 2, and 6 of the '423 patent, claims 1, 7, and 8 of the '574 patent, and claims 1 and 9 of the '915 patent.

> "a link where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine"

**Court**
Indefinite

Each of the asserted independent claims recites connecting a fax machine to a computer "via a passive link." Oki Data contends that "passive link" is indefinite because, during prosecution of the '811 patent, the patentee took contradictory positions as to whether a passive link must extend (i) all the way to the I/O bus of a computer, or (ii) only to a port on the housing of the computer, such that an "intervening apparatus" (such as a fax modem) may be located between the passive link and the I/O bus. (D.I. 151 at 15) Infinity agrees that in order for the Court not to find "passive link" indefinite, one of skill in the art would have to be reasonably certain as to where the passive link ends and the computer begins (Tr. 61-62), and further agrees that one of skill in the art would look to the prosecution history in determining the meaning of "passive link" (*id.* at 67).

During prosecution of the '811 patent, the patentee maintained that a passive link must extend to a computer's I/O bus without any intervening devices. In response to an obviousness rejection, the patentee distinguished U.S. Patent No. 5,452,106 to Perkins ("Perkins") on the basis that Perkins did not include a passive link as recited by the claims. (D.I. 148-29 Ex. 25) Perkins discloses a system for connecting a fax machine to a computer via a "facsimile device 3" that connects to the fax machine via a phone line and to the computer via a serial cable. (Perkins 3:59-68) The facsimile device might be a standalone device or, alternatively, be located on a card inside a computer. (*Id.* 3:59-68, 9:24-32) The patentee argued that Perkins lacked a passive link because, in Perkins' configuration, the "facsimile transmission ***never enters the computer***

8

*I/O bus until after it is processed by device 3....* Contrary to the above, [in the claimed invention], ***the non-intercepted data enters through the [serial] type connector port of the computer and passes directly to the I/O bus*** ... providing a true non-intercepted signal between the facsimile transceiver and the computer." (D.I. 148-29 Ex. 25 at 12) (emphasis added)

However, during a later *ex parte* reexamination of the '811 patent, the patentee argued that a passive link need only extend to a computer port without any intervening device. During reexamination, the claims were rejected as anticipated by U.S. Patent No. 5,900,947 to Kenmochi et al. ("Kenmochi"). (D.I. 151-5 Ex. 52 at 14) The patentee responded that Kenmochi was not prior art because the effective priority date of the claims was not the filing date of the '056 application, but rather the filing date of the '278 application, of which the '056 application was a continuation-in-part. (D.I. 148-18 Ex. 14 at 7) The patentee argued that written description for the "passive link" term could be found in Figures 2b, 2c, and 2d, which were present in the '278 application. (*Id.*) Specifically, the patentee argued that passive link in each of Figs. 2b-2d was the RJ-11 (phone line) cable from the fax machine to the RJ-11 port on the computer's fax modem. (*Id.*) On this understanding, a passive link need only be uninterrupted from the fax machine to a port on the computer; it may be further processed in the computer before it passes to the I/O bus. (*See id.*; U.S. Patent App. No. 90/013,208, Final Office Action dated 2/11/2015 at 20-25 (concluding, based on patentee's arguments, that "the claimed 'passive link' ... constitutes the direct physical connection between the facsimile machine and the computer, ***regardless of whether the PC included an internal modem***") (emphasis added).

Oki Data's diagrams characterizing the prosecution history, reproduced below, accurately depict the understanding a person of ordinary skill would have when reading the prosecution history.

9


Location of the passive link to the "computer" in distinguishing *Perkins*


Location of the passive link to the "computer" during re-examination

(D.I. 151 at 8)

Oki Data has met its burden to show indefiniteness by clear and convincing evidence. During prosecution, the patentee distinguished prior art references by characterizing "passive link" as requiring the link to be entirely passive from the fax machine to the computer's I/O bus (in the patentee's words, "a true non-intercepted digital signal"). (D.I. 128-29 Ex. 25 at 12) This is depicted in the first diagram above. Then, however, in order to claim the filing date of the '278 application, the patentee characterized "passive link" as only requiring the link to be passive from the fax machine to a port on the computer. (D.I. 148-18 Ex. 14 at 7) This is depicted in the second diagram above.

Under the patentee's first definition, the '278 application lacks written description for a passive link because the '278 application does not disclose a link that was passive until the computer's I/O bus. Rather, under that definition, each embodiment disclosed in the '278 application includes an intervening apparatus – a modem – between the fax machine and the I/O bus. (*See* '811 patent, Figs. 2b-2d) Conversely, the patentee's second definition, used to overcome the written description rejection, would not distinguish the Perkins patent because Perkins teaches connecting a fax machine to a computer a via an intervening device: a "facsimile

10

device" inside the computer. (Perkins 9:24-32) The patentee's contentions regarding "passive link" have been materially inconsistent. Hence, a person of ordinary skill in the art would not be reasonably certain as to which of the patentee's two inconsistent definitions of "passive link" is used in the claims, rendering the claims indefinite. *See Teva*, 789 F.3d at 1345 (holding claim term indefinite where patentee used two inconsistent definitions of term during prosecution).

Infinity is not correct that the PTAB's construction during reexamination is "the definitive outcome of the prosecution history." (D.I. 159 at 5) The PTAB's construction of a claim term is not binding on a district court. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60 (Fed. Cir. 2007). Moreover, the PTAB did not consider the argument now before this Court. (*See generally* D.I. 149-9 Ex. 3) The issue before the PTAB was whether there was written description for both analog and digital signals in the '278 patent, and the PTAB only rejected the contention that the patentee, in distinguishing Perkins, limited the claims to "***solely analog*** transmission." (D.I. 149-9 Ex. 3 at 12) (emphasis in original). The PTAB's conclusion is not relevant to the question before this Court: whether the patentee took inconsistent positions with respect to the ***endpoint*** of the passive link.

Infinity's argument that its construction does not, in fact, conflict with Perkins also misses the mark. (*See* D.I. 159 at 7-9) Infinity's post hoc distinction of Perkins does not negate the patentee's far more specific arguments during prosecution. *See Tech. Properties*, 849 F.3d at 1359 (holding that "the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference" but rather to "the actual arguments made"). Moreover, Infinity's distinction fails on its merits: Perkins contemplates the facsimile device being inside a PC and, so, envisions embodiments with a direct, passive connection between a fax machine and a PC port. (Perkins, 9:24-32)

C. "computer"[4]

| Infinity |
|---|
| No construction necessary |
| **Oki Data** |
| Indefinite |
| **Court** |
| Indefinite |

The parties' dispute over "computer" mirrors their dispute over "passive link." Infinity contends that the term is a "straightforward word" that is "readily understood by a person of skill in the art, the Court and jury without construction." (D.I. 149 at 20) Oki Data argues that "computer" is indefinite for essentially the same reasons as it provided for "passive link." (D.I. 151 at 20)

The Court agrees with Oki Data for the same reasons as provided above for "passive link." Each claim that recites "passive link" states that the passive link connects a "facsimile machine" and a "computer." (*See, e.g.*, '811 patent. cl. 12) (reciting "transferring data signals . . . via a passive link between the facsimile machine and the computer")) Given that the two definitions for "passive link" vary in their endpoint – one connects the fax machine to a port on a computer, and another connects the fax machine to the I/O bus of the computer – it follows that the scope of "computer" changes depending on the definition. Specifically, where the passive link ends at a computer port, the computer begins at the port, and where the passive link ends at the I/O bus, the computer begins at the I/O bus. Accordingly, a person of ordinary skill in the art

---

[4] The term "computer" appears in claims 1, 2, 4, 6, 7, and 18-20 of the '811 patent, claims 1-4, and 6 of the '423 patent, claims 1, 2, 4, 5, 7, and 8 of the '574 patent, and claims 1 and 9 of the '915 patent.

would not be reasonably certain as to what the claims mean by "computer." *See Teva*, 789 F.3d at 1345.

Infinity provides several arguments as to why "computer" is not indefinite, but none are persuasive. (*See* D.I. 149 at 20-21; D.I. 159 at 10) Infinity points to the statement in the specification that "[t]he PC . . . may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT)." (D.I. 149 at 20) Infinity also notes that "computer" has been construed or given its plain meaning in many unrelated patents. (*Id.*) Infinity further points out that defendants in related cases have not suggested that "computer" is indefinite. (D.I. 159 at 10) Yet neither the specification nor any case cited by Infinity resolves the ambiguity created by the prosecution history of the patents-in-suit. The fact that an indefiniteness argument was not made by defendants in other cases does not render the argument being made here less meritorious.

## III. CONCLUSION

The Court will construe the disputed terms as explained above. An appropriate Order follows.